914 A.2d 348

IN THE MATTER OF THE ADOPTION OF N.J.A.C. 5:94
AND 5:95 BY THE NEW JERSEY COUNCIL ON
AFFORDABLE HOUSING.

IN RE SUBSTANTIVE AND PROCEDURAL RULES OF THE NEW
JERSEY COUNCIL ON AFFORDABLE HOUSING FOR THE PE-
RIOD BEGINNING DECEMBER 20, 2004 (N.J.A.C. 5:94–1 ET.
SEQ. AND N.J.A.C. 5:95–1 ET. SEQ.).

IN RE ADOPTION OF THIRD ROUND REGULATIONS, N.J.A.C.
5:94, BY THE COUNCIL ON AFFORDABLE HOUSING.

IN RE ADOPTION OF THIRD ROUND SUBSTANTIVE RULES OF
THE NEW JERSEY COUNCIL ON AFFORDABLE HOUSING.

Superior Court of New Jersey
Appellate Division

Argued October 25, 2006—Decided January 25, 2007.

2

4

Before Judges CUFF, WINKELSTEIN and BAXTER.

*Susan J. Kraham* argued the cause for appellant Coalition for Affordable Housing and the Environment in A–1960–04 (Rutgers Environmental Law Clinic, attorneys; *Ms. Kraham and John M. Payne,* on the brief).

*Stephen Eisdorfer* argued the cause for appellant New Jersey Builders Association in A–2665–04 (*Hill Wallack,* attorneys; *Mr. Eisdorfer, Thomas F. Carroll and Henry T. Chou,* on the brief).

*Kevin D. Walsh* argued the cause for appellant Fair Share Housing Center in A–2674–04 (*Peter J. O'Connor,* attorney; *Mr. O'Connor and Mr. Walsh,* on the brief).

*Carl S. Bisgaier* argued the cause for appellant ISP Management Company, Inc. in A–2706–04 (*Flaster/Greenberg,* attorneys; *Mr. Bisgaier and David R. Oberlander,* on the brief).

*Donald M. Palombi,* Deputy Attorney General, argued the cause for respondent New Jersey Council on Affordable Housing

(*Stuart Rabner,* Attorney General, attorney; *Geraldine Callahan, George N. Cohen, Pamela Gellert, Mr. Palombi,* Deputy Attorneys General, on the briefs).

*Stuart R. Koenig* argued the cause for amici curiae New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys (*William John Kearns, Jr.,* General Counsel and of counsel; *Edwin W. Schmierer, Edward J. Buzak, Jeffrey R. Surenian, Michael Jedziniak, and Mr. Koenig,* on the brief).

*Lori Grifa* argued the cause for amicus curiae New Jersey Chapter of the National Association of Industrial and Office Properties (*Wolff & Samson,* attorneys; *Ms. Grifa* and *Thomas J. Trautner, Jr.,* on the brief).

The opinion of the court was delivered by

CUFF, P.J.A.D.

In this appeal, we address a multifaceted challenge to the validity of the substantive rules of the Council on Affordable Housing (COAH) for the third round that calculate affordable housing needs from 1999 to 2014 and establish criteria for satisfaction of the need between 2004 and 2014.[1] *N.J.A.C.* 5:94–1.1 to – 9.2. The challenges focus on several rules that govern the calculation of housing need, the allocation of that need, and compliance mechanisms. The third round rules depart from the practice utilized in rounds one and two of assigning a specific fair share number to individual municipalities. Rather, the third round methodology depends on the net increase in the number of jobs and the number of housing units a municipality experiences between 2004 and 2014. Appellants contend that this methodology is contrary to, and ill-designed to respond to, the constitutional mandate to provide affordable housing to the residents of this

---

[1] Four separate appeals were filed contesting the validity of the regulations. The appeals were briefed separately and calendared back-to-back. We consolidate the appeals for purposes of this opinion.

State. We affirm in part, reverse in part, and remand for further proceedings consistent with this opinion.

COAH's first round rules extended from 1987 through 1993, and its second round covered a cumulative period from 1987 through 1999. *See In re Six Month Extension of N.J.A.C. 5:91–1 et seq.,* 372 *N.J.Super.* 61, 73, 855 *A.*2d 582 (App.Div.2004), *certif. denied,* 182 *N.J.* 630, 868 *A.*2d 1033 (2005). In May 1999, COAH readopted the second-cycle substantive rules, establishing an expiration date of May 2004. *Id.* at 74, 855 *A.*2d 582.

Following a protracted period of study and review characterized by this court as "dramatic and inexplicable," *id.* at 95–96, 855 *A.*2d 582, COAH first proposed the third round substantive and procedural rules in October 2003. 35 *N.J.R.* 4636(a) (October 6, 2003) (substantive rules); 35 *N.J.R.* 4700(a) (October 6, 2003) (procedural rules). On April 27, 2004, the Supreme Court denied a petition for certification on a challenge to the absence of final third round substantive rules, taking judicial notice of the fact that COAH's proposed rules would expire if not adopted by October 6, 2004. *In re Failure of N.J. Council on Affordable Hous.,* 180 *N.J.* 148, 849 *A.*2d 182 (2004).

In response to voluminous comments,[2] COAH re-proposed both the substantive rules, *N.J.A.C.* 5:94, and procedural rules, *N.J.A.C.* 5:95, in August 2004. 36 *N.J.R.* 3691(a) (August 16, 2004) (substantive rules); 36 *N.J.R.* 3851(a) (August 16, 2004) (procedural rules).[3] Following the receipt of many additional

---

[2] The proposed rules were also the subject of considerable comment in the legal press. *See* Thomas Jay Hall, *COAH Publishes Proposed New Regulations on Affordable Housing Policy: Now What?, N.J. Law Journal,* March 8, 2004, at S–5 to –6; Edward J. Buzak, *Growth Share Is Path to Progress, N.J. Law Journal,* June 21, 2004, at S–2 to –4; Carl S. Bisgaier and Tracy A. Siebold, *Mount Laurel: End Game?, N.J. Law Journal,* June 21, 2004, at S–4 to –5; Janet S. Kole, *The Nat'l Quest for Smart Growth: How Does New Jersey Stack Up?, N.J. Law Journal,* June 21, 2004, at S–6 to –7.

[3] At the same time, the Housing Mortgage and Finance Agency proposed the Uniform Housing Affordability Control regulations which are at issue in the

comments, COAH adopted the substantive and the procedural rules on December 20, 2004. 36 *N.J.R.* 5748(a) (December 20, 2004) (substantive rules); 36 *N.J.R.* 5895(a) (December 20, 2004) (procedural rules). New Jersey Builders Association (Builders Association), Fair Share Housing Center (Fair Share), ISP Management Company, Inc. (ISP) and the Coalition for Affordable Housing and the Environment (CAHE) filed timely notices of appeal.

In its appeal, Builders Association argues that COAH is obliged to fulfill the constitutional and statutory obligation to provide affordable housing, but the third round rules do not satisfy or advance that obligation. It also contends that the adoption of a growth share methodology and the rules that abandon the concept of reallocated present need abrogate COAH's constitutional and statutory obligation to remedy the effects of exclusionary zoning. Builders Association also contends that "the statistical machinations" of specific rules massively reduce fair share obligations, and arbitrarily dilute its municipal fair share obligations contrary to constitutional and statutory obligations. Builders Association also argues that the abandonment by COAH of a prior policy that required a developer to receive an offsetting benefit, such as a density bonus, when required to provide lower income housing is unconstitutional and unlawful. In light of the tortured and tortuous rule-making process, Builders Association urges this court to appoint a Special Master to develop and to impose lawful regulations and oversee the adoption by COAH of lawful and constitutional regulations.

Fair Share argues that the third round methodology understates the affordable housing need in this State, overstates the units that will be created by secondary sources, inexplicably reduces the need previously determined in the first and second

companion appeal, *In re Adoption of Uniform Housing Affordability Controls by the New Jersey Housing and Mortgage Finance Agency,* 390 *N.J.Super.* 89, 914 A.2d 402, 2007 *WL* 195733 (App.Div.2007), decided this date.

rounds and is, therefore, unconstitutional. It also contends that the growth share methodology employed by COAH is unconstitutional and any form of need allocation that rests exclusively on municipal decisions is unconstitutional. Fair Share also argues that the permitted methods for allocating and satisfying third round obligations perpetrate the exclusion of lower-income families and fail to meet the goals of the *Mount Laurel*[4] doctrine or the Fair Housing Act of 1985 (FHA), *N.J.S.A.* 52:27D–301 to –329. It also contends that regional contribution agreements violate state and federal civil rights and undermine the *Mount Laurel* doctrine and the affordability range under COAH's third round rules is unconstitutional. This latter argument is addressed in our opinion in *In re Adoption of Uniform Housing Affordability Controls by the New Jersey Housing and Mortgage Finance Agency, supra,* 390 *N.J.Super.* at 105, 914 *A.2d* 413 .

ISP addresses the manner in which second round obligations are treated by third round methodology. It argues that by deeming a municipality that received a second round vacant land adjustment to have met its second round obligation based on implementation of all terms of its substantive certification, the third round rules ignore the municipality's obligation to consider in subsequent rounds property that later becomes available for development. Furthermore, ISP contends that by permitting an offset for residential and non-residential demolitions in calculating the growth share obligation, the third round rules unconstitutionally dilute the fair share obligation. ISP also challenges the regulation that permits utilizing square footage of new non-residential development as a surrogate to predict job growth. It contends this failure to employ more direct means and more reliable information dilutes the fair share obligation. ISP also

---

[4] *S. Burlington County NAACP v. Twp. of Mount Laurel,* 92 *N.J.* 158, 456 *A.2d* 390 (1983) (*Mount Laurel II* ); *S. Burlington County NAACP v. Twp. of Mount Laurel,* 67 *N.J.* 151, 336 *A.2d* 713, *appeal dismissed and cert. denied,* 423 *U.S.* 808, 96 *S.Ct.* 18, 46 *L.Ed.2d* 28 (1975) (*Mount Laurel I* ).

argues that granting "rental bonus" credits for housing units never built and granting new construction credits for extension of expiring affordability controls violates the *Mount Laurel* "realistic opportunity" requirement and unconstitutionally dilutes the fair share obligations.

CAHE urges that, properly implemented, the growth share methodology is a constitutionally acceptable method for satisfying the prospective component of the *Mount Laurel* housing obligation. It argues, however, that *N.J.A.C.* 5:94 is not growth share and does not insure that growth within the State will fairly share the creation of opportunities for affordable housing. It also contends that the third round methodology understates the need for affordable housing, overstates the manner in which the need is satisfied by secondary sources, and inexplicably reduces need in the second and third rounds.

COAH responds that the selected growth share methodology satisfies the statutory and constitutional mandate. It further contends that the growth share methodology will actually work better to assure that the affordable housing obligation will be more closely tied to where housing and jobs are actually being created. It also insists that it used the most reliable data available and employed that data to make adjustments in the present affordable housing need consistent with its statutory and constitutional obligations. Finally, it emphasizes that the adoption of the third round rules should not occasion a re-examination of certain regulations previously approved by the courts or used in prior round methodologies.

Amicus New Jersey Chapter of the National Association of Industrial and Office Properties (NAIOP) argues *N.J.A.C.* 5:94–4.4(b) permits mandatory set-asides and payments in lieu that are confiscatory and unconstitutional. It also urges that the authorization of in lieu payments without standards to guide municipal action is inconsistent with COAH's mission and, therefore, arbitrary, capricious and unreasonable.

Amici New Jersey State League of Municipalities and New Jersey Institute of Local Government Attorneys (Municipal Amici) argue that the growth share regulations are valid, and a calculation of reallocated present need is not required to satisfy the constitutional obligation. They also contend that *Mount Laurel II* and subsequent opinions addressing the constitutional obligation authorize the municipal zoning options found in the third round rules. They also urge that *N.J.A.C.* 5:94–4.19, which increases the percentage of a municipal housing obligation that may be satisfied by age-restricted housing from twenty-five percent to fifty percent, is constitutional.

We commence our discussion with a brief review of the *Mount Laurel* doctrine and a review of the statutory codification of the doctrine. We also briefly review the prior regulatory experience before we address the specific objections raised by appellants to the third round rules.

I

In *Mount Laurel I, supra,* the Court held that a zoning ordinance in a developing municipality that did not make an appropriate variety and choice of housing realistically possible was contrary to the public welfare. 67 *N.J.* at 173–74, 336 *A.2d* 713. The same municipality could satisfy its constitutional obligation by adopting a zoning ordinance that provided a realistic opportunity for the construction of its fair share of the present need and future regional need for low- and moderate-income housing. *Ibid.* Eight years later, the Court returned to the issue.

In *Mount Laurel II, supra,* the Court reaffirmed the doctrine and fashioned a procedure for use by trial courts to determine municipalities' obligation to provide the opportunity for low- and moderate-income housing. 92 *N.J.* at 220–23, 456 *A.2d* 390. In the course of the opinion, the Court reminded us that "the doctrine ... arise[s] from ... underlying concepts of fundamental fairness in the exercise of governmental power." *Id.* at 209, 456

*A.2d* 390. The Court also reiterated the constitutional basis for the *Mount Laurel* doctrine. Chief Justice Wilentz stated:

> The constitutional power to zone, delegated to the municipalities subject to legislation, is but one portion of the police power and, as such, must be exercised for the general welfare. When the exercise of that power by a municipality affects something as fundamental as housing, the general welfare includes more than the welfare of that municipality and its citizens: it also includes the general welfare—in this case the housing needs—of those residing outside of the municipality but within the region that contributes to the housing demand within the municipality. Municipal land use regulations that conflict with the general welfare thus defined abuse the police power and are unconstitutional. In particular, those regulations that do not provide the requisite opportunity for a fair share of the region's needs for low and moderate income housing conflict with the general welfare and violate the state constitutional requirements of substantive due process and equal protection.
>
> [*Id.* at 208–09, 456 *A.2d* 390 (citing *Mount Laurel I, supra,* 67 *N.J.* at 174, 181, 336 *A.2d* 713).]

The Court has consistently re-affirmed the doctrine and its constitutional basis. *Toll Bros., Inc. v. Twp. of W. Windsor,* 173 *N.J.* 502, 511–13, 803 *A.2d* 53 (2002); *In re Petition for Substantive Certification Filed by the Twp. of Warren,* 132 *N.J.* 1, 9–13, 622 *A.2d* 1257 (1993); *Van Dalen v. Washington Twp.,* 120 *N.J.* 234, 240, 576 *A.2d* 819 (1990); *Hills Dev. Co. v. Twp. of Bernards,* 103 *N.J.* 1, 40, 510 *A.2d* 621 (1986).

█ In *Mount Laurel II, supra,* the Court also recognized that every municipality has an obligation to provide a realistic opportunity for affordable housing to its resident poor, and that the obligation to provide for the needs of the region will be borne by those municipalities designated as growth areas. 92 *N.J.* at 214–25, 226–27, 243–44, 456 *A.2d* 390. The Court instructed that whether an opportunity is realistic "depend[s] on whether there is in fact a likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed." *Id.* at 221–22, 456 *A.2d* 390. *See Toll Bros., supra,* 173 *N.J.* at 552, 803 *A.2d* 53 (realistic opportunity includes economic viability of permitted housing); *In re Petition for Substantive Certification Twp. of Southampton,* 338 *N.J.Super.* 103, 120–21, 768 *A.2d* 233 (App. Div.) (housing element that included a tract without water or sewer service did not provide a realistic opportunity for the

construction of affordable housing), *certif. denied*, 169 *N.J.* 610, 782 *A.2d* 428 (2001).

The Court also noted that *Mount Laurel* litigation would ordinarily include proof of the number of housing units needed presently and in the future. *Mount Laurel II, supra*, 92 *N.J.* at 215, 456 *A.2d* 390. "Numberless" resolution was disfavored. The Court said:

> "Numberless" resolution of the issue based upon a conclusion that the ordinance provides a realistic opportunity for *some* low and moderate income housing will be insufficient. Plaintiffs, however, will still be able to prove a *prima facie* case, without proving the precise fair share of the municipality, by proving that the zoning ordinance is substantially affected by restrictive devices, that proof creating a presumption that the ordinance is invalid.
>
> [*Id.* at 216, 456 *A.2d* 390.]

The Court also addressed the judicial remedy, commonly referred to as the "builder's remedy," and devised a scheme for the consistent and hopefully expeditious resolution of litigation. *Id.* at 216–18, 456 *A.2d* 390. Finally, the Court reiterated its preference for legislative action in this field. *Id.* at 212–13, 352, 456 *A.2d* 390.

The designated *Mount Laurel* judges adopted methodologies to determine need and to allocate the need on a regional basis. In *AMG Realty Co. v. Township of Warren*, 207 *N.J.Super.* 388, 453, 504 *A.2d* 692 (Law Div.1984), Judge Serpentelli noted the key to any methodology was not its ability to produce verifiably accurate results but to use "reliable data, as few assumptions as possible, and an internal system of checks and balances." He continued:

> Reliable data refers to the best source available for the information needed and the rejection of data which is suspect. The need to make as few assumptions as possible refers to the desirability of avoiding subjectivity and avoiding any data which requires excessive mathematical extrapolation. An internal system of checks and balances refers to the effort to include all important concepts while not allowing any concept to have a disproportionate impact.
>
> [*Ibid.*]

The three *Mount Laurel* trial judges generally followed the methodology published in *AMG Realty, supra*. Present need was calculated on the number of low- and moderate-income households occupying overcrowded units, or units lacking complete plumbing

facilities or adequate heating. *Id.* at 401, 420, 504 *A.2d* 692; *Countryside Props., Inc. v. Mayor and Council of Ringwood,* 205 *N.J.Super.* 291, 295–96, 500 *A.2d* 767 (Law Div.1984); *Van Dalen v. Washington Twp.,* 205 *N.J.Super.* 308, 314–16, 500 *A.2d* 776 (Law Div.1984). The courts recognized that houses could be dilapidated with adequate plumbing and heating, and that inadequate plumbing or heating did not necessarily mean that the property was dilapidated. The judges concluded that the best data was produced from the United States Census. *AMG Realty, supra,* 207 *N.J.Super.* at 420, 504 *A.2d* 692; *Countryside Props.,* 205 *N.J.Super.* at 296, 500 *A.2d* 767. They also determined that they should apply indicators or surrogates of dilapidated housing and then statistically extrapolate the percentage of those dilapidated units occupied by low- and moderate-income households. *See e.g. Countryside Props., supra,* 205 *N.J.Super.* at 296–97, 500 *A.2d* 767; *Van Dalen, supra,* 205 *N.J.Super.* at 314, 500 *A.2d* 776.

Judge Skillman interpreted *Mount Laurel II* to require the inclusion of low- and moderate-income households occupying overcrowded but not dilapidated dwellings. *Countryside Props., supra,* 205 *N.J.Super.* at 296, 500 *A.2d* 767; *Van Dalen, supra,* 205 *N.J.Super.* at 315–16, 500 *A.2d* 776. Judge Serpentelli also used units built before 1940 as a surrogate or marker for calculating housing deficiency, *AMG Realty, supra,* 207 *N.J.Super.* at 420–21, 504 *A.2d* 692; yet he determined that cost-burdened households should not be included in the present need calculations of low- and moderate-income housing. *Id.* at 422–23, 504 *A.2d* 692.

The three *Mount Laurel* judges also addressed reallocation of present need. Noting that inner cities had an indigenous need that far exceeded their fair share and declaring that these cities should not be expected to provide a disproportionate share of needed housing, the court would determine the total regional housing stock and calculate what percentage of it was substandard, *AMG Realty, supra,* 207 *N.J.Super.* at 401, 504 *A.2d* 692. If any municipality's indigenous need in relationship to its housing stock was in excess of that regional percentage, the excess was

assigned to a reallocation pool. *Ibid.* That pool would be distributed to all municipalities that contained any area designated for growth in the State Development Guide Plan (SDGP), excluding certain urban aid municipalities. *Ibid.*

Prospective need for affordable housing, statewide and regionally, was determined on the number of low- and moderate-income households expected to form over the ensuing decade. *Id.* at 403, 504 *A.*2d 692. This data was to be derived from the decennial Census. The calculation of prospective need involved a prediction based on data relying on two components for measuring population growth: labor market conditions and past population trends. *Id.* at 426, 504 *A.*2d 692.

Once present and prospective need in a region was derived, the next step was to allocate the need to individual municipalities in a region. Allocation of present need was determined based on: (1) the number of growth area acres within the municipality compared to the number of growth area acres within the region; (2) the number of jobs in the municipality compared to the number of covered jobs within the region; and (3) the wealth of the municipality, that is, the ratio of municipal median income to the regional median income. *Id.* at 404, 504 *A.*2d 692. Prospective need was to be determined using the three factors cited above, as well as a municipality's employment growth within the preceding ten years. *Id.* at 405, 504 *A.*2d 692. A municipality's growth area was an important factor because "[a]ny reasonable methodology must account for a municipality's physical capacity to provide space for new construction." *Id.* at 431, 504 *A.*2d 692. Judge Serpentelli recognized that it might be preferable to substitute the amount of a municipality's vacant developable land within a growth area in lieu of the growth area designation, but he rejected that alternative because of the lack of reliable data. *Id.* at 432, 504 *A.*2d 692.

Present employment was a factor in determining prospective need because a "major goal of *Mount Laurel* is to enable people to live in decent housing near their place of employment." *Id.* at 433, 504 *A.*2d 692. Jobs generate the need for shelter. *Ibid.* In

addition, "to the extent that jobs create ratables, it affects the municipality's fiscal capacity." *Ibid.*

A municipality's median income compared to the regional median income was a relevant factor because it accounted for "the town's ability to defray the infrastructure costs of high density building, to identify prior exclusionary policies or to reward prior inclusionary efforts." *Id.* at 434, 504 *A.2d* 692. The median income factor more equitably distributed some of the financial burdens a municipality would experience in zoning for affordable housing. *Id.* at 435, 504 *A.2d* 692.

Finally, the *Mount Laurel* judges offered a number of pertinent observations regarding municipal compliance with the allocated fair share. To a significant degree, the economy, private enterprise and other branches of government would determine whether the affordable housing need was satisfied. *J.W. Field Co. v. Twp. of Franklin*, 204 *N.J.Super.* 445, 457, 499 *A.2d* 251 (Law Div.1985). For private enterprise to assist in meeting the need, the development community would need to find it profitable to construct affordable housing; if a builder had insufficient incentives, affordable housing would not be built. *AMG Realty, supra,* 207 *N.J.Super.* at 446, 504 *A.2d* 692; *Allan–Deane Corp. v. Twp. of Bedminster,* 205 *N.J.Super.* 87, 115, 500 *A.2d* 49 (Law Div. 1985). Experience had shown the *Mount Laurel* judges that twenty percent was the maximum set-aside that would induce builders to participate in the construction of inclusionary development; any requirement in excess of twenty percent would defeat the actual construction of affordable housing. *Urban League of Essex County v. Twp. of Mahwah,* 207 *N.J.Super.* 169, 205–06, 504 *A.2d* 66 (Law Div.1984); *J.W. Field Co., supra,* 204 *N.J.Super.* at 467, 499 *A.2d* 251. In addition, excessively high set-asides could require the middle class, including those earning just over eighty percent of the median income, to subsidize the *Mount Laurel* target population by paying significantly more for housing. *Van Dalen, supra,* 205 *N.J.Super.* at 339–40, 343–44, 500 *A.2d* 776. Municipalities may not impose set-asides that are so high that

they "impose an excessive and unfair burden upon middle income households when there are other suitable means of achieving" *Mount Laurel* goals. *Id.* at 344, 500 *A.*2d 776.

In 1985, the Legislature enacted the FHA and the State Planning Act, *N.J.S.A.* 52:18A–196 to –207. The FHA created COAH to provide an administrative mechanism for implementing the *Mount Laurel* doctrine. *N.J.S.A.* 52:27d–307. The FHA directed COAH to divide the State into housing regions, estimate the present and prospective need for low- and moderate-income housing at both the State and regional levels, and adopt criteria and guidelines that would enable a municipality to determine its fair share of its region's present and prospective housing need. *Ibid.*

The State Planning Act charged the State Planning Commission with the task of adopting a plan to identify areas for growth, conservation, agriculture, open space or other appropriate designations. *N.J.S.A.* 52:18A–199(a). This plan, referred to as the State Plan, was designed to be used as a tool for assessing appropriate locations for infrastructure, housing and conservation, but it is not binding on municipalities and was not intended to validate or invalidate specific ordinances. *Bailes v. Twp. of E. Brunswick,* 380 *N.J.Super.* 336, 358–59, 882 *A.*2d 395 (App.Div.), *certif. denied,* 185 *N.J.* 596, 889 *A.*2d 443 (2005); *Mount Olive Complex v. Twp. of Mount Olive,* 340 *N.J.Super.* 511, 543, 774 *A.*2d 704 (App.Div.2001), *remanded on other grounds,* 174 *N.J.* 359, 807 *A.*2d 192 (2002). However, under the FHA, one of COAH's responsibilities is to adjust municipal fair share based on available vacant and developable land, infrastructure considerations or other environmental factors, and to see that the pattern of development is not inconsistent with the planning designations in the State Plan. *N.J.S.A.* 52:27D–307c(2). In calculating present and prospective need estimates, COAH must give "appropriate weight to . . . implementation of" the State Plan. *N.J.S.A.* 52:27D–307e. The State Planning Commission must provide COAH with annual economic growth and development projections for each housing region, and COAH must periodically adjust regional need

calculations based upon the amount of affordable housing generated through any federal, state, municipal or private housing program. *Ibid.*

COAH is required to consider pertinent information from studies, government reports, and information from other branches of government, including data from the State Planning Commission. *Ibid.* It can, however, adopt any approach or school of thought espoused by experts in relevant fields based on its determination of the appropriate response to the constitutional obligation and the purposes of the FHA. *Hills Dev. Co., supra,* 103 *N.J.* at 33, 510 *A.*2d 621.

The Court upheld the constitutionality of the FHA against arguments that: (1) its implementation would result in excessively delaying the construction of affordable housing, (2) the moratorium on builder's remedies was unconstitutional, and (3) limiting a court's scope of review, because a party contesting COAH's grant of substantive certification must overcome the presumption of validity by clear and convincing evidence, *N.J.S.A.* 52:27D–317, violated the right of a party to contest government action by filing a complaint in lieu of prerogative writs. *Hills Dev. Co., supra,* 103 *N.J.* at 40–47, 510 *A.*2d 621. The Court noted that the "statutory scheme addresses the main needs delineated in ... prior decisions on this matter, namely, the consistency on a statewide basis of the determination of regional need, fair share, and the adequacy of the municipal measures." *Id.* at 37, 510 *A.*2d 621. The Court assumed that COAH would perform its duty to implement the *Mount Laurel* doctrine "with determination and skill." *Id.* at 21, 510 *A.*2d 621. It was within the discretion of the Legislature and COAH to implement the doctrine with techniques not previously sanctioned by the judiciary. "Regions, regional need, fair share, all may be different; the locus of the obligation may be different; the timetable different; the method of satisfying the obligation different; and compliance may in fact become voluntary." *Id.* at 51–52, 510 *A.*2d 621.

The FHA also allows municipalities to transfer up to fifty percent of their fair share to another municipality within the region by entering into a regional contribution agreement (RCA) with the other municipality. *N.J.S.A.* 52:27D–312. The Court upheld the constitutionality of RCAs. *Hills Dev. Co., supra,* 103 *N.J.* at 47 n. 13, 510 *A.*2d 621; *In re Petition for Substantive Certification Filed by Twp. of Warren,* 247 *N.J.Super.* 146, 163–65, 588 *A.*2d 1227 (App.Div.1991), *rev'd on other grounds,* 132 *N.J.* 1, 622 *A.*2d 1257 (1993). However, the Court cautioned that:

No one should assume that our exercise of comity today signals a weakening of our resolve to enforce the constitutional rights of New Jersey's lower income citizens. The constitutional obligation has not changed; the judiciary's ultimate duty to enforce it has not changed; our determination to perform that duty has not changed.

[*Hills Dev. Co., supra,* 103 *N.J.* at 65, 510 *A.*2d 621.]

## A. The First and Second Round Rules

COAH adopted the first round substantive rules covering the period 1987 to 1993, on July 14, 1986, effective August 4, 1986. 18 *N.J.R.* 1527(a) (August 4, 1986). Codified at *N.J.A.C.* 5:92–1.1 to – 18.20 and accompanying technical Appendices A through F, the rules adopted methodologies similar to those developed in *AMG Realty, supra,* 207 *N.J.Super.* 388, 504 *A.*2d 692.

COAH continued to use several surrogates to establish present need, such as overcrowding, age of unit, and lack of plumbing, kitchen or heating facilities as indicators of dilapidated housing. *N.J.A.C.* 5:92, Appendix A at 92–47 (Supp.2–20–96). The excess present need in urban aid municipalities was reallocated to all municipalities within the regional growth area. *Id.* at 92–48. Cost-burdened households were not a component of present need. Prospective need was calculated through statistical analyses to project the number of low- and moderate-income households that would form between 1987 and 1993. *Id.* at 92–49. As in *AMG Realty,* the need was allocated to municipalities, except urban aid municipalities, based on employment within the municipality, projected employment within the municipality, the percentage of the

municipality in a growth area, and the municipality's wealth. *Id.* at 92–49 to 92–50.

COAH's methodology differed from that used in *AMG Realty* in that COAH took into account secondary sources of housing supply and demand in calculating both statewide and regional need. Demolitions added to housing need because they reduce the number of available housing units. *Id.* at 92–52. COAH also identified three market forces, filtering, residential conversions and spontaneous rehabilitation, that operate to reduce overall housing need. *Id.* at 92–52 to 92–54.

The first and second round rules recognized filtering as the most significant market force in reducing housing need. Filtering is "a downward adjustment of housing which recognizes that the housing requirements of lower-income groups can be served by supply additions to the higher-income sectors of the housing market." *Id.* at 92–52. In other words, as newer, more desirable housing options became available in the housing market, middle- and upper-income households would move out of the existing housing, making it available to become the home for a lower-income household. *Ibid.* "Filtering is predicated on the existence of housing surpluses which cause housing prices to drop because of the excess of housing supply over demand." *Ibid.* Multifamily housing was "the most likely type of housing to filter down," so COAH granted a "filtering adjustment" to the extent that a community contained multifamily housing, noting, however that filtering was more likely to occur in urban rather than suburban areas. *Ibid.*

"Residential conversion" occurs when additional dwelling units were created from already existing structures. *Id.* at 92–53. "Spontaneous rehabilitation" occurs when dilapidated housing, affordable to low- and moderate-income households, was rehabilitated by the private market without the assistance of any government program. *Ibid.*

The first round methodology employed by COAH resulted in a total statewide present and prospective need for the years 1987 to

1993 of approximately 200,000 units, but after factoring in secondary sources of housing supply and demand, the total statewide need dropped to 147,707 units. *Id.* at 92–50, 92–54. The bulk of the reduced need was attributable to filtering, with COAH estimating that from 1987 to 1993 approximately 51,000 sound housing units would become affordable to, or filter down to, low- and moderate-income households. *Id.* at 92–53.

The second round substantive rules (1987 to 1999) continued the same methodology, notwithstanding its complexity, because COAH deemed it fair and because the methodology embodied "the most up to date and sophisticated procedures for housing need determination and allocation." *N.J.A.C.* 5:93, Appendix A. For a variety of reasons, including information gleaned from the 1990 Census, the total statewide affordable housing need for the second cycle decreased from over 145,000 units to approximately 86,000 affordable units. *See County of Morris v. Riverview Condos., Inc.,* 304 *N.J.Super.* 322, 336–37, 700 *A.2d* 884 (App.Div.1997), *certif. denied,* 152 *N.J.* 364, 704 *A.2d* 1299 (1998).

COAH also permitted municipalities to reduce their fair share figures through a number of credits and adjustments, including: (1) credits for affordable housing constructed between 1980 and 1986, *N.J.A.C.* 5:93–2.15, –3.2; (2) credits for substantial compliance, *N.J.A.C.* 5:93–3.6; (3) up to a two-for-one credit for rental housing, *N.J.A.C.* 5:93–5.15; and (4) adjustments for municipalities that lacked sufficient vacant land or did not have access to water and sewer, *N.J.A.C.* 5:93–4.2, –4.3. Finally, municipalities were permitted to satisfy up to twenty-five percent of their fair share through age-restricted affordable housing. *N.J.A.C.* 5:93–5.14.

Numerous challenges to COAH's first round and second round methodology have been largely unsuccessful. The Court upheld COAH's decision to rely on planning designations in the SDGP, and to refuse to accept evidence that a municipality had a larger growth area than designated in the SDGP. *Van Dalen, supra,* 120 *N.J.* at 246–47, 576 *A.2d* 819. While the Court recognized that the SDGP was not the ideal tool for determining the location and size

of a municipality's *Mount Laurel* obligation, COAH "may reasonably have concluded that for the time being the advantages of easy administration and stability in the planning process afforded by the SDGP outweigh the possibly greater precision that could accrue from a more flexible planning formulation." *Id.* at 246, 576 A.2d 819. The Court observed that the method of allocating affordable housing would need to be updated periodically based on current demographic data, *id.* at 247, 576 A.2d 819, and signaled that it was not prepared to defer to data that was clearly out-of-date. *Id.* at 243, 576 A.2d 819. This court has also rejected claims by municipalities that COAH was arbitrary in considering a municipality's wealth as an allocation factor that would increase its fair share, and that COAH should reduce the fair share if a municipality lacked sufficient developable vacant land. *Twp. of Bernards v. Dep't of Cmty. Affairs,* 233 *N.J.Super.* 1, 19, 21, 558 A.2d 1 (App.Div.), *certif. denied,* 118 *N.J.* 194, 570 A.2d 959 (1989).

Housing advocates unsuccessfully challenged several components of COAH's regulations: (1) permitting municipalities to receive credit for affordable accessory apartments; (2) granting bonus credits for rental units; (3) using filtering as a secondary source of housing; and (4) refusing to reallocate credits granted to one municipality to increase the fair share of other municipalities in the region. *Calton Homes, Inc. v. Council on Affordable Hous.,* 244 *N.J.Super.* 438, 582 A.2d 1024 (App.Div.1990), *certif. denied,* 127 *N.J.* 326, 604 A.2d 601 (1991). Housing advocates were also unsuccessful in persuading this court that COAH's affordability regulations, which did not require municipalities to zone for housing for the very poor, violated the *Mount Laurel* doctrine. *Twp. of Warren, supra,* 247 *N.J.Super.* at 179–83, 588 A.2d 1227. This court also upheld COAH's credit without controls regulation, *Non–Profit Affordable Hous. Network v. N.J. Council on Affordable Hous.,* 265 *N.J.Super.* 475, 478–82, 627 A.2d 1153 (App.Div.1993), and the regulation ensuring that proposed affordable housing developments have access to water and sewer, *In re Adoption of Amendments to N.J.A.C. 5:93–1.3 and 5:93–5.3,* 339 *N.J.Super.* 371, 385–91, 772 A.2d 9 (App.Div.2001).

On the other hand, the Supreme Court invalidated a COAH occupancy preference regulation that would have allowed municipalities to set aside fifty percent of their fair share housing for low- and moderate-income persons who lived or worked in the municipality. *Twp. of Warren, supra,* 132 *N.J.* at 41–42, 622 *A.*2d 1257. This court also invalidated, as inconsistent with the FHA, a technical regulation that capped a municipality's fair share at 1000 units. *Calton Homes, supra,* 244 *N.J.Super.* at 453, 582 *A.*2d 1024. The Legislature responded by amending *N.J.S.A.* 52:27D–307(e). *See L.* 1993, *c.* 31.

### B. *The Third Round Rules*

COAH's third round substantive rules are designed to permit municipalities to meet a cumulative fair share beginning in 1987 and ending on January 1, 2014. *N.J.A.C.* 5:94–1.1(d). There are three major components: (1) a municipality's "rehabilitation share" based on the condition of housing revealed in the data gathered for the 2000 Census, previously known as a municipality's indigenous need; (2) a municipality's unsatisfied prior round obligation (1987 through 1999), satisfaction of which will be governed by the second round rules; and (3) a municipality's "growth share" based on housing need generated by statewide job growth and residential growth from 1999 through 2014. *N.J.A.C.* 5:94–1.2. The "delivery period" for the growth share obligation is ten years, from January 1, 2004 to January 1, 2014. *N.J.A.C.* 5:94–1.1(d).

As was the case for "indigenous need" in the prior rounds, the rehabilitation share is the measure of a municipality's old, crowded, deficient housing occupied by low- and moderate-income households. *N.J.A.C.* 5:94–1.4; *N.J.A.C.* 5:94, Appendix A at 94–33; *N.J.A.C.* 5:94, Appendix B at 94–52. As before, dilapidated housing is determined by using statistical measures to calculate the number of units within a municipality that are overcrowded, built before 1940, lack adequate plumbing facilities, or lack adequate kitchen facilities. *N.J.A.C.* 5:94, Appendix A at 94–33.

COAH estimated that there were approximately 60,000 dilapidated units in need of rehabilitation in the State, of which approximately 40,000 were occupied by low- and moderate-income households. *Id.* at 94–34. However, the actual statewide rehabilitation share, as determined by COAH, is approximately 25,000 units because COAH reduced the 40,000 unit rehabilitation share by two calculations that are challenged in this appeal. *Id.* at 94–36. In doing so, COAH applied a "reallocated present need credit" of approximately 8500 units, and a "spontaneous rehabilitation credit" of approximately 7300 units. *Ibid.*

COAH calculates that the statewide new construction obligation from the prior rounds (1987–1999) totals approximately 77,500 units. *Id.* at 94–37. Of these, COAH estimates that approximately 45,000 new units have been built, or are under construction, have planning board approval, or have realistic zoning in place. 35 *N.J.R.* 4637 (October 6, 2003).[5] As noted, municipalities are responsible for fulfilling their prior round obligation. *N.J.A.C.* 5:94–2.1(a)(2). A municipality is entitled to credits for housing activities undertaken to fulfill that obligation, *N.J.A.C.* 5:94–3.2; to a reduction in their prior round obligation if sites zoned for affordable housing remain realistic, *N.J.A.C.* 5:94–3.3; and to an adjustment in their first or second round fair share obligation if it lacks sufficient vacant land or adequate access to water or sewer, *N.J.A.C.* 5:94–3.4.

As in the prior rounds, COAH relies on statistics and estimates for future population growth to determine prospective need, which for the third round will cover 1999 to 2014. *N.J.A.C.* 5:94, Appendix A at 94–38. Using projections available from the Office of Smart Growth, COAH estimates that New Jersey's population will grow by 833,188, from 8,348,880 in 1999 to 9,232,068 in 2014. *Ibid.* The expected population growth will equate to 335,096 new

---

[5] This does not include nearly 8000 units that have been transferred pursuant to an RCA, or the more than 12,000 deficient housing units that have been rehabilitated. 35 *N.J.R.* 4637 (October 6, 2003).

households, approximately forty percent of which (140,365) will be in need of affordable housing. *Id.* at 94–40. However, COAH finds that secondary sources of supply and demand (filtering, spontaneous rehabilitation, residential conversions, publicly assisted housing and demolitions) will reduce the number of affordable units needed to meet the prospective need from approximately 140,000 units to 52,726 units, which COAH concludes is the figure that represents "adjusted projected need." *Id.* at 94–46. COAH attributes a substantial percentage of the reduced need to filtering. *Id.* at 94–42. COAH projects that 59,156 non-dilapidated housing units will become affordable to low- and moderate-income households between 1999 and 2014 through filtering. *Ibid.*

COAH next addresses how to produce the 52,726 new units identified in the adjusted projected need calculation, representing the increased number of low- and moderate-income households. *Id.* at 94–46 to 94–49. Discussing housing supply and demand as related to employment, which forms the basis of the "growth share" methodology for determining municipal fair share obligations, COAH predicts the construction of 245,190 new housing units and an employment increase of 679,302 new jobs. *Id.* at 94–47 to 94–48. If one out of eight of those new units is affordable, the State will gain 25,575 affordable units. *Id.* at 94–49. Similarly, if new employers are required to produce one affordable unit for each twenty-five jobs produced, 27,172 new units will be constructed. *Ibid.*

To meet the prospective need as defined by COAH, each municipality must provide for the development of one affordable housing unit for every eight new market-rate residential units projected, plus one affordable unit for every twenty-five newly created jobs. *N.J.A.C.* 5:94–2.1(d). Municipalities will not calculate each new or additional job created in the municipality. Rather, COAH has determined that various categories of new construction will create varying numbers of jobs, depending upon the category, or "use group," of the construction. *N.J.A.C.* 5:94, Appendix E at 94–86. For example, an office building will gener-

ate three jobs per 1000 square feet, whereas a strip mall will generate one job per 1000 square feet. *Ibid.* However, municipalities will not be responsible for the new jobs created by, for example, rehabilitating an existing vacant office, store or factory.

COAH expresses its belief that the growth share approach "will hew more closely to the doctrinal underpinning of *Mount Laurel* in that municipalities will provide a realistic opportunity for construction of a fair share of low and moderate income housing based on sound land use and long range planning." *N.J.A.C.* 5:94–1.1(b). The growth share methodology "allows each municipality to determine its capacity and desire for growth in a way that is consistent with the policies of the State Development and Redevelopment Plan; its *Mount Laurel* obligation arises as a share of that growth." *N.J.A.C.* 5:94–1.1(c). Finally, COAH asserts that "[t]his method tightens the working definition of 'realistic opportunity' to meet the constitutional obligation with not merely a good faith attempt, but with the actual provision of housing for low and moderate income households." *N.J.A.C.* 5:94–1.1(d).

## II

We commence our review of the challenged methodology and specific regulations with a discussion of the scope of our review. We do not write on a clean slate.

The Legislature has directed COAH to adopt rules to discharge its constitutional and statutory obligations. *N.J.S.A.* 52:27D–307. Regulations of an administrative agency enacted pursuant to legislative authority and to implement legislative policy enjoy a presumption of validity. *Twp. of Warren, supra,* 132 *N.J.* at 26, 622 *A.*2d 1257. In *Township of Warren,* the Court held that the "principle of judicial deference to agency action is particularly well-suited to our review of administrative regulations adopted by COAH to implement the [FHA], . . . ." *Id.* at 27, 622 *A.*2d 1257. *See also Mount Laurel II, supra,* 92 *N.J.* at 305–06, 456 *A.*2d 390. The Court emphasized the legislative and executive branches' response to the constitutional obligation and the broad

powers bestowed on COAH by the legislature to address " 'one of the most difficult constitutional, legal and social issues of our day—that of providing suitable and affordable housing for citizens of low and moderate income.' " *Twp. of Warren, supra,* 132 *N.J.* at 27, 622 *A.*2d 1257 (quoting *Hills Dev. Co., supra,* 103 *N.J.* at 21, 510 *A.*2d 621). Due to the novelty of the legislative scheme and the evolving nature of the process, the Court has declared that COAH " 'is entitled to a reasonable degree of latitude, consistent with the legislative purpose....' " *Ibid.* (quoting *Van Dalen, supra,* 120 *N.J.* at 246, 576 *A.*2d 819). On the other hand, "[t]he breadth of COAH's discretion in selecting methodologies to implement the [FHA] ... does not dilute COAH's duty to adopt regulatory methods that are consistent with the statutory goals." *Id.* at 28, 622 *A.*2d 1257.

Several appellants urge that we should subject the challenged regulations to heightened scrutiny because they are designed to address a constitutional imperative—the provision of suitable housing for low- and moderate-income citizens in this State. The Court in *Township of Warren* was also faced with a challenge to an occupancy preference regulation promulgated by COAH that appellants contended diluted the constitutional obligation. *Id.* at 4–5, 622 *A.*2d 1257. Notwithstanding the constitutional dimensions of the agency responsibility, the Court declared that the well-established scope of review of administrative action would be used to review the occupancy-preference regulation. Justice Stein wrote:

> In reviewing administrati[ve] actions, the judicial role is ordinarily confined to three inquiries: (1) whether the agency's action violates enabling acts, express or implied legislative policy; (2) whether there is substantial evidence and records to support the findings upon which the agency based application of the legislative policies; and (3) whether, in applying the legislative policies to the facts, the agency clearly erred by reaching a conclusion that could not reasonably have been made upon a showing of relevant factors.
> [*Id.* at 28, 622 *A.*2d 1257 (internal citations omitted).]

Justice Stein also held that in the rule-making setting, "we impose the analogous requirement that the agency demonstrate at a minimum that its action can be understood to be consistent with the underlying legislative mandate." *Id.* at 41, 622 *A.*2d 1257 (citations omitted).

■ Application of this standard allows, indeed requires, a reviewing court to ensure that COAH has faithfully carried out its statutory mandate. *Twp. of Southampton, supra,* 338 *N.J.Super.* at 114, 768 *A.*2d 233. COAH's regulations must be consistent with the central purpose of the FHA to provide affordable housing on a regional basis consistent with both sound planning principles and the *Mount Laurel* doctrine, and COAH may not adopt any regulation that undermines its methodology for calculating or allocating regional fair share obligations. *Twp. of Warren, supra,* 132 *N.J.* at 28, 622 *A.*2d 1257; *Non–Profit Affordable Hous. Network, supra,* 265 *N.J.Super.* at 479, 627 *A.*2d 1153. Indeed, the Court's invalidation of the occupancy preference for municipal residents in *Township of Warren, supra,* 132 *N.J.* at 30–31, 41–42, 622 *A.*2d 1257, undermines appellants' implicit contention that the traditional presumption of validity enjoyed by any agency action and the limited scope of review traditionally employed prevents vindication of the constitutional right.

### III

In addressing the broad-based and multifaceted challenges to the third round rules, we have elected to group the challenges by issue. To that end, we have identified three general groups: (1) calculation issues, (2) allocation issues, and (3) compliance mechanisms. We commence our discussion with the calculation issues that include estimating housing need, defining substandard housing, and the use of secondary sources of supply, such as filtering and tax credit developments.

### A. *Calculation Issues*

Implementing the *Mount Laurel* doctrine requires a determination of regional housing need. *Mount Laurel II, supra,* 92 *N.J.* at 215–16, 252–54, 456 *A.*2d 390. The FHA directs COAH to "[e]stimate the present and prospective need for low and moderate income housing at the State and regional levels[.]" *N.J.S.A.*

52:27D–307(b). For the first round, covering 1987 to 1993, COAH calculated a total statewide need of 199,966 units, consisting of 85,134 units of indigenous need, 34,411 units of reallocated present need, and 80,421 units of prospective need. *N.J.A.C.* 5:92, Appendix A at 92–46. After taking into account secondary sources of supply and demand including demolitions, filtering, residential conversion and spontaneous rehabilitation, the statewide need (also known as pre-credited need) was reduced by approximately 50,000 to 145,707 units. *Ibid.*

For the second round, in which need was calculated on a cumulative basis from 1987–1999, the total statewide need was 140,610 units, which, after reductions for secondary sources of supply and demand and other adjustments, resulted in a calculated need of 86,308 units. *N.J.A.C.* 5:93, Appendix A at 93–47.

The total third round statewide need has been estimated at 77,594 units, consisting of a rehabilitation share (formerly indigenous need) of 24,847 units and a projected statewide growth share of 52,747 units. *N.J.A.C.* 5:94, Appendix A at 94–30. This number does not include the municipalities' prior round obligations, which are to be determined individually. *Ibid.* As noted above, COAH arrived at this figure by assuming a statewide total projected need for 1999–2014 of 140,365 units, *id.* at 94–41, less 87,639 affordable units derived from secondary sources of supply and demand. The total adjusted projected need is 52,726 units. *Id.* at 94–46.

On appeal, appellants contend that COAH used flawed methodology, committed errors of law, and drastically underestimated the total statewide need for affordable housing so that the 1999–2014 adjusted projected need of 52,726 units would match the number of units that COAH predicted would be produced by its new growth share methodology, a total of 52,747 units. *Id.* at 94–49.

1. *Excluding cost-burdened low- and moderate-income households and other needy households from the present need or "rehabilitation share" equation*

A municipality's "rehabilitation share" is one of three

components that make up its fair share.[6] *N.J.A.C.* 5:94–1.2(d); *N.J.A.C.* 5:94–2.1(a). A municipality's fair share plan must both calculate its rehabilitation share and specify methods of meeting its rehabilitation share. *N.J.A.C.* 5:94–4.3. The rehabilitation share "is the number of existing housing units as of April 1, 2000 that are both deficient and occupied by households of low or moderate income as determined through the methodology provided in Appendix A, or through a survey of the municipal housing stock conducted in accordance with the provisions with *N.J.A.C.* 5:93." *N.J.A.C.* 5:94–2.1(b).

It is undisputed that a number of low- and moderate-income households in this State pay a disproportionately high percentage of their income for decent housing. COAH's parent agency, the Department of Community Affairs (DCA), estimates that forty-six percent of households that rent pay more than thirty percent of their income towards housing. *State of N.J., 2005–2009 Consolidated Plan.* That report states that "New Jersey is currently the second most expensive place in the nation to rent a two-bedroom apartment." *Ibid.*

Appellants Builders Association, Fair Share and CAHE contend that COAH violates the *Mount Laurel* doctrine and the FHA by failing to include the cost-burdened poor in estimating present need. COAH responds that neither the Supreme Court nor the Legislature has required inclusion of the cost-burdened poor in the present need equation; in fact, existing precedent supports COAH's decision not to include the cost-burdened poor. We agree.

In its constitutional analysis, the *Mount Laurel II* Court never held that the present need calculation must include the cost-burdened poor. The Court held that every municipality, irrespective of whether it was in a growth area, "should provide a realistic

---

[6] The other two components are remaining prior round obligation and the share of the affordable housing need generated by a municipality's actual growth. *N.J.A.C.* 5:94–2.1(a)2 and 3.

opportunity for decent housing for at least some part of its resident poor who now occupy dilapidated housing." 92 *N.J.* at 214, 456 *A.*2d 390.

Judge Serpentelli acknowledged that adding the cost-burdened poor to present need would significantly increase fair share obligations. *AMG Realty, supra,* 207 *N.J.Super.* at 422–23, 504 *A.*2d 692. Although that was not a sufficient reason to justify their exclusion from the formula, he cited a number of other reasons. First, many people do not fully report their income. *Id.* at 423, 504 *A.*2d 692. Second, some people, by choice, pay "a disproportionate amount of their income for housing." *Ibid.* Third, some people choose lesser quality housing than they can afford, thereby creating a housing "mismatch." If household unit income and housing unit cost were more closely correlated, more units would be available for needy families. *Ibid.* Fourth, many retirees who have lower incomes nonetheless have substantial assets. *Ibid.* Fifth, the needs of lower income households could be met more appropriately through income maintenance programs rather than revision of land use regulations. *Ibid.* Sixth, many of the cost-burdened poor also occupy substandard units, thereby creating a duplication in the present need count. *Ibid.*

The Court has recognized COAH's election to follow the *AMG Realty* decision by not including the cost-burdened poor in calculating present need. *Twp. of Warren, supra,* 132 *N.J.* at 14–15, 622 *A.*2d 1257. The Court stated: "Notwithstanding the methodology adopted by the Law Division in *AMG Realty Co.,* the [FHA] vests in COAH the responsibility for determining whether identifiable financially-needy households are to be considered in the calculation of indigenous or regional need for affordable housing." *Id.* at 15, 622 *A.*2d 1257. This statement was part of a background discussion. The Court also recognized the inclusion of the cost-burdened poor was an alternative available to it in its methodology for calculating regional need. *Id.* at 36, 622 *A.*2d 1257. It did not, however, require COAH to do so.

The absence of any adverse rulings on this issue and the omission of the cost-burdened poor in COAH's second round rules indicates to us that COAH has continued to exercise its discretion to exclude this category in promulgating the third round rules. The agency offered several reasons for doing so. First, the purpose of the *Mount Laurel* doctrine is to address the need for affordable housing caused by exclusionary zoning ordinances. 36 *N.J.R.* 5809 (December 20, 2004). COAH did not believe that the intent of the *Mount Laurel* decisions and the FHA were "to subsidize the income of those below 80 percent of median who live in standard housing." *Ibid.* Second, it was unrealistic to expect that any method of compliance achievable through the amendment of land use ordinances could meet the needs of the cost-burdened poor. According to COAH: "If housing cost burden is currently calculated in the State of New Jersey as involving those below 80 percent of median who (1) rent and pay more than 30 percent of their income for housing, or (2) own and pay more than 50 percent of their income for housing—then as of 2000, this would amount to 636,000 households." *Id.* at 5809–10. To meet the income needs of this category would require an annual affordable housing subsidy program of over four billion dollars per year. *Id.* at 5810. Assuming that the private sector could produce 260,000 total housing units per decade, and that each of those developments had a twenty percent set-aside, then it would take more than 122 years to meet current need when factoring in the cost-burdened poor. *Ibid.* Third, a number of state and federal programs exist to assist the poor who paid too much for decent housing. *Ibid.; see also* 36 *N.J.R.* 5798.

We conclude that the decision by COAH to exclude the cost-burdened poor from the present need or rehabilitation share calculation cannot be considered arbitrary or in contravention of its statutory authority. The Court has repeatedly emphasized the variety of methodologies that can be used to determine need and the multiplicity of ways to address that need and the broad authority bestowed on COAH by the Legislature. *Twp. of Warren, supra,* 132 *N.J.* at 28, 622 *A.*2d 1257; *Van Dalen, supra,* 120

*N.J.* at 246, 576 *A.*2d 819; *Hills Dev. Co., supra,* 103 *N.J.* at 35, 510 *A.*2d 621. Moreover, the Court has previously stated that the FHA has vested in COAH the discretion to determine whether identifiable cost-burdened households should be included in the calculation of need. *Twp. of Warren, supra,* 132 *N.J.* at 15, 622 *A.*2d 1257.

The agency decision does not offend the State Constitution or any express or implied policy of the FHA, is based on reasonable facts and assumptions, and is soundly reasoned. Moreover, the decision is consistent with existing precedent and nearly twenty years of practical implementation.

■ Appellants also claim that COAH failed to include other categories of the poor in the present need equation, specifically those who currently have no permanent housing, those who reside in institutions or group quarters, or those who live in overcrowded housing. COAH offered detailed reasons in response to this objection. 36 *N.J.R.* 5758–59. First, "overcrowding is one of the surrogates of deficient housing used by the Council in estimating those low and moderate households living in substandard housing, calculated in the rehabilitation share." 36 *N.J.R.* 5759. Second, COAH's estimates also include, to a certain extent, the homeless, mentally ill and those paying a disproportionate share of their income on housing. *Ibid.* The agency explained its approach in the following response:

> While [COAH]'s methodology has never counted households in dormitory shelters or people who have no means of shelter, it does include those living in motels or existing transitional housing if such shelter is substandard. The methodology also includes all low- and moderate-income households that have formed since 1987 and all future eligible low- and moderate-income households expected to form between 1999 and 2014. These households include the homeless, mentally ill and those paying a disproportionate share of income on housing.
>
> [*Ibid.*]

Third, COAH views its mission as addressing the "segment of need caused by municipal land use practices." *Ibid.* There are a number of other programs to provide income subsidies to the categories of households listed in the objection. *Ibid.* Finally:

> The methodology also addresses those living in group quarters. The methodology employed by [COAH] eliminates most individuals living in institutions, group quarters, and boarders/lodgers from potential low- and moderate-income housing demand. This removes from direct count those people who comprise prison/sanitarium, college, nursing home, boarders/boarding homes, clergy residences, and other related populations. However, those residents in group homes are included in the Round Three methodology with each two persons found in this type of facility contributing to the demand for one additional unit. Sub-households and sub-families are not separately distinguished as this would double-count existing housing deterioration and no information is available on how or if sub-families/sub-households would choose to separate in the future.
>
> [*Ibid.*]

Appellants do not contend that the third round rules for calculating rehabilitation share differ in any substantial way from the first and second round rules for establishing present need, at least with respect to the homeless or those currently residing in institutions or group quarters. This is a methodology that has been used without challenge for the past twenty years, and COAH has offered persuasive reasons for continuing it. Therefore, we conclude that COAH's decision is not arbitrary.

### 2. *Defining substandard housing*

 COAH's second round rules used seven "surrogates" or indicators from the 1990 Census to approximate the number of deficient or dilapidated housing units. *N.J.A.C.* 5:93, Appendix A at 93-50 to –51. These are: (1) units built prior to 1940; (2) overcrowded units, that is, units having 1.01 or more persons per room; (3) inadequate plumbing; (4) inadequate kitchen facilities; (5) inadequate heating fuel, that is, no fuel at all or using coal or wood; (6) inadequate sewer services; and (7) inadequate water supply. *Ibid.* A unit having two of these surrogates was deemed deficient. *Id.* at 93–51. The surrogates can only be estimated at the regional level, and resulted in a total statewide need of 60,281 units, consisting of an indigenous need of 42,739 units and a reallocated present need of 17,542 units. *Id.* at 93–52.

The third round rules use fewer surrogates to approximate the number of deficient or dilapidated housing units, consisting of: (1) overcrowded units built prior to 1940; (2) units lacking adequate

plumbing facilities; and (3) units lacking adequate kitchen facilities. *N.J.A.C.* 5:94, Appendix A at 94–33. Using these, COAH arrived at a statewide rehabilitation share of 24,847 units. *Id.* at 94–36. One reason for the much lower number is that COAH no longer reallocates the excess present need, that is, the number of deficient units, in poor inner cities. *Id.* at 94–35.[7]

Appellants contend that COAH was arbitrary in altering the second round methodology for no discernable reason. Fair Share accuses COAH of changing the methodology in order to reduce the rehabilitation share that municipalities will have to meet. In defending the change, COAH argues: (1) it now uses Census data for each individual municipality; (2) some of the data used in the second round is no longer available from the Census; and (3) using the available data would have actually resulted in a lower present need.

Scientific precision is not achievable. Any methodology must use reliable data, make as few assumptions as possible, and have an internal system of checks and balances. *Van Dalen, supra,* 120 *N.J.* at 247, 576 *A.2d* 819; *AMG Realty, supra,* 207 *N.J.Super.* at 453, 504 *A.2d* 692. In *AMG Realty, supra,* Judge Serpentelli used three surrogates: (1) overcrowding; (2) inadequate plumbing facilities; and (3) inadequate heating facilities. 207 *N.J.Super.* at 401, 504 *A.2d* 692. In *Countryside Properties, supra,* 205 *N.J.Super.* at 295–96, 500 *A.2d* 767, Judge Skillman included overcrowded units occupied by the target population, as well as dilapidated units. He relied on a statement in *Mount Laurel II, supra,* 92 *N.J.* at 243, 456 *A.2d* 390, that all municipalities must adopt land use regulations that "provide a realistic opportunity for the construction of their fair share of the region's present lower income housing need generated by present dilapidated or overcrowded lower income units, including their own." *Countryside Props., supra,* 205 *N.J.Super.* at 295, 500 *A.2d* 767. However, COAH is not bound by any particular methodology; it

---

[7] We discuss the challenge to this provision later in this opinion.

has broad discretion to take a different approach from that taken by the courts. *Hills Dev. Co., supra,* 103 *N.J.* at 33, 51, 510 *A.*2d 621.

COAH replaced the seven surrogates used in the second round methodology with the three surrogates used in the third round because the U.S. Census no longer reports units not connected to an existing water system or sewer or septic system, and because units using coke, coal or wood as a primary heating source are virtually nonexistent. 36 *N.J.R.* 5792–93 (December 20, 2004). As a counterbalance to the reduction in surrogates, COAH modified the second round methodology to provide that a unit has to have only one deficiency to be classified as deteriorated. 36 *N.J.R.* 5793. COAH stated that "[t]he third round methodology is the most accurate and most encompassing measure of local housing deterioration because variables are reported that actually exist at the local level." *Ibid.* In addition, the third round methodology resulted in a higher estimate of local deterioration than would be found using the second round methodology without the data no longer reported by the Census. *Ibid.*

Given COAH's broad discretion in selecting an appropriate methodology, we conclude that the agency was not arbitrary in limiting the number of surrogates to lack of plumbing, lack of kitchen facilities, or old and overcrowded units. Furthermore, the third round estimate of dilapidated units is significantly lower than the second round estimate, in part, because COAH no longer reallocates present need, an issue addressed later in this opinion.

Nevertheless, COAH's decision to eliminate newer overcrowded units from the present need calculation warrants additional discussion. Under the third round methodology, an overcrowded unit that was built after 1940, and that is occupied by a low- or moderate-income household, will not generate a present need for affordable housing that must be satisfied. Overcrowded units are now incorporated into the present need calculation only if the units were built before 1940. This appears to conflict with Judge Skillman's conclusion in *Countryside Properties, supra,* 205

*N.J.Super.* at 295–96, 500 *A.*2d 767, that *Mount Laurel II* requires both dilapidated and overcrowded lower income units to be factored into the present need calculation. However, neither the first round nor second round methodology provided that overcrowding, standing alone, rendered a housing unit deficient, and therefore, includable in what was then called the "indigenous need" component of the present need calculation. *N.J.A.C.* 5:92, Appendix A at 92–47; *N.J.A.C.* 5:93, Appendix A at 93–51 to –52.

Twenty years of prior practice supports COAH's decision not to include overcrowding as a factor that, standing alone, would add to the rehabilitation share. Because the third round methodology captures a newer overcrowded unit in the rehabilitation share if it lacks plumbing or kitchen facilities, and the other previously-used surrogates are unavailable in the current Census data, COAH's new approach as to overcrowded units is neither arbitrary nor irrational. Finally, in this instance, there is no basis for this court to declare that COAH is using flawed data. The data is derived from the Census at the municipal level, it is reliable, and it involves as few assumptions as possible.

### 3. *Filtering*

COAH's methodology has always assumed that secondary sources of supply and demand impact housing need. One of those secondary sources—filtering—assumes that some sound housing units will become less expensive over time and that they will become affordable to low- and moderate-income households. *N.J.A.C.* 5:94, Appendix A at 94–42. COAH concluded that between 1999 and 2014, filtering would result in 59,156 sound housing units becoming affordable to low- or moderate-income households. Therefore, COAH subtracted that figure from the overall statewide projected need of 140,365 units. *Id.* at 94–41 to –42. COAH also used filtering and the other secondary sources in calculating the new construction obligation that carried forward into the third round from the first and second rounds, which was 77,527 units. *Id.* at 94–37.

Appellants Builders Association, Fair Share and CAHE contend that filtering is not occurring in New Jersey, and that COAH's explanation for recalculating prior round obligations defies comprehension. We agree.

In the second round rules, COAH described filtering as "a downward adjustment of housing which recognizes that the housing requirements of lower-income groups can be served by supply additions to the higher-income sectors of the housing market," because more affluent households vacate existing housing units, making them available for lower income households. *N.J.A.C.* 5:93, Appendix A at 93–56. "Filtering is predicated on the existence of housing surpluses, which cause housing prices to drop because of the excess of housing supply over demand." *Ibid.* In response to comments on the second round rules, COAH identified five factors that must exist for filtering to occur. 36 *N.J.R.* 5801 (December 20, 2004). These factors were reviewed and supported by Anthony Downs, a housing economist at The Brookings Institution. *Ibid.* Downs described the five factors as follows: (1) an overall housing surplus; (2) a surplus of new housing construction over new household formation; (3) no major non-price barriers, such as discrimination, that limit mobility among low-income households; (4) moderate operating costs for newly built units; and (5) a limited number of poor households. *Id.* at 5801–03.

 Fair Share argues that COAH relied on flawed data to conclude that filtering was occurring. First, COAH relied on the draft of a study from 1990; second, more recent studies submitted during the rule-making process suggest that filtering is not occurring at all or not nearly to the extent suggested by COAH; and third, since the 1990s, housing prices have risen rapidly. Fair Share concludes that since the mid–1990s, housing demand exceeds supply and that more households have formed than new housing has been built.

We conclude that the COAH premise, that housing is filtering down to low- and moderate-income households, lacks support in the record. COAH states that it relied on the *American Housing*

*Survey* for a ten-year period, 1989 to 1999. *N.J.A.C.* 5:94, Appendix A at 94–42. That data showed that approximately fifteen percent of the units occupied by low- or moderate-income households in 1989 were occupied by middle- or upper-income households in 1999 (an upward filter), but that seventeen percent of the units occupied by middle- or upper-income households in 1989 were occupied by low- and moderate-income households in 1999 (a downward filter). *Ibid.* Thus, on a net basis 1.9 percent of the units filtered down during that decade. *Ibid.*

COAH offered no data that housing is becoming more affordable in New Jersey during the period 1999 to 2004, and if housing prices have gone down between the time COAH issued the third round rules and the time of our review, the decline is negligible or not of sufficient dimension to offset the dramatic increases of the past several years. Indeed, rather than relying on actual data, COAH obtained the ten-year (1989–99) number of estimated and filtered units and multiplied that figure by 1.5 to obtain the adjusted number of filtered units for fifteen years (1989–2004). The COAH assumptions also stand in stark contrast to the DCA's 2005–2009 Consolidation Plan that states that since 2000 both owner-occupied and rental housing has become more expensive.

COAH's statutory obligation is to from "time to time" estimate the present and prospective need for affordable housing at the State and regional levels. *N.J.S.A.* 52:27D–307(b). *See also Van Dalen, supra,* 120 *N.J.* at 247, 576 *A.2d* 819. COAH should have access to data that would demonstrate whether, in 2004 or 2006, there exists an overall housing surplus in New Jersey, that more houses are being built than households being formed, and that housing with moderate operating costs is now being constructed. Should COAH find that the conditions for filtering currently exist, based on the most recent data, then it can use filtering as a valid secondary source of housing supply and apply this source to its estimate of overall housing need. With supportable data, this court would be bound by the principle that a reviewing court should defer to the expertise of an administrative agency charged

with enforcing a statute. *N.J. Chapter of Nat'l Ass'n of Indus. & Office Parks v. N.J. Dep't of Envtl. Prot.,* 241 *N.J.Super.* 145, 165, 574 *A.*2d 514 (App.Div.), *certif. denied,* 122 *N.J.* 374, 585 *A.*2d 379, 380 (1990). On the other hand, " '[i]t is one thing for a court to defer to the judgment of the planners, even where it disagrees; it is another to defer to a document that is clearly out of date where a deferral might frustrate a constitutional obligation.' " *Van Dalen, supra,* 120 *N.J.* at 243, 576 *A.*2d 819 (quoting *Mount Laurel II, supra,* 92 *N.J.* at 242, 456 *A.*2d 390). *Accord N.J. Chapter, supra,* 241 *N.J.Super.* at 165, 574 *A.*2d 514 ("While we must defer to the agency's expertise, we need not surrender to it."). Without adequate supporting data, this court cannot uphold COAH's projection that from 1999 to 2014, over 59,000 non-dilapidated housing units will become more affordable to the poor.

We reach this conclusion even though COAH's use of filtering in the first round rules was upheld in *Calton Homes, supra,* 244 *N.J.Super.* at 459, 582 *A.*2d 1024. In rejecting the argument that the use of filtering resulted in an unconstitutional dilution of real housing need, this court stated:

> Calton's assertion that filtering does not occur in suburbs because "condominiums and townhouses in the suburbs can be expected to appreciate in resale value and apartment rents can be expected to increase" is without support in the record. We are unable to conclude that [COAH]'s premise that housing does filter to the lower classes is unreasonable. The mere fact that others disagree with [COAH]'s conclusion that filtering takes place does not require its reversal. [COAH] should be given sufficient time to test the validity of its theories in this regard. As stated in *Van Dalen v. Washington Tp.,* 120 *N.J.* at 234, 576 *A.*2d 819 "[b]ecause the legislative scheme is novel, the implementation of its goals is necessarily an evolving process. Accordingly, COAH is entitled to a reasonable degree of latitude, consistent with the legislative purpose, in its effort to ascertain which planning and statistical studies best serve the long-term statutory objectives." [*Ibid.*]

By now, the legislative scheme is no longer novel and COAH has had ample time to test its opinion that filtering substantially reduces the need for affordable housing in New Jersey. In fact, in *Van Dalen,* the Court observed that continued reliance on less than optimal sources of information may raise questions of the reasonableness of its use. *Van Dalen, supra,* 120 *N.J.* at 247, 576

*A.*2d 819. Here, COAH's parent agency, the DCA, has concluded that housing is becoming more expensive, a finding that is contrary to COAH's prediction that filtering will occur during the third round. The number used by COAH need not be precise, but it must be reasonably based. Failing to recognize other data or attempting to reconcile the data undermines the agency position that use of the survey data is reasonable.

The second way in which COAH used filtering was to reduce the prior round obligation to 77,527 units. 36 *N.J.R.* 5789; *N.J.A.C.* 5:94, Appendix A at 94–37. A prior round obligation is adjusted based on new Census data; for example, in the second round, Census data showed that COAH had over-estimated prospective need in its first round rules. COAH therefore reduced the statewide need figure. *See N.J.A.C.* 5:93, Appendix A at 93–55; *County of Morris, supra,* 304 *N.J.Super.* at 336–37, 700 *A.*2d 884. However, data from the 2000 Census indicated that the prior round obligation must be increased by twenty-five percent. *N.J.A.C.* 5:94, Appendix A at 94–37; 36 *N.J.R.* 5788–89. Fair Share states that "COAH was right to adjust the prospective need upward to reflect actual growth." That is because actual growth outpaced original projections. *Ibid.* However, COAH subtracted 8580 units of that unanticipated growth by using secondary sources, such as filtering and residential conversions. *N.J.A.C.* 5:94, Appendix A at 94–37. Fair Share reasons that an increase in secondary sources does not necessarily follow an increase in prospective need. Moreover, according to Fair Share, at the municipal level the reduction for secondary sources produces inexplicable results, such as substantially reducing the prior round obligations of the Borough of Paramus, Wayne Township and Princeton Township.

As argued by Fair Share, more explanation is warranted here. First, if filtering is not occurring, then the adjustments are unwarranted. Second, COAH supplied data showing a very substantial decrease in the second round obligation of Paramus, Wayne and Princeton Township. These adjustments purportedly

grew out of the need to *increase* prospective need figures because New Jersey's second round growth was greater than expected; therefore, dramatic *decreases* in the second round obligations of those municipalities are troublesome.

We do not invalidate the use of filtering as a secondary source. Its use, however, must be based on the most recent and reliable data available to the agency. Reliance on a survey that does not account for the dynamic housing market and the rapidly escalating housing costs in this State in the last sixteen years requires invalidation of the regulation that rests on this inadequate data. On remand, COAH must consider more recent data relevant to whether the five conditions for filtering currently exist in New Jersey, as well as any other data supplied by the interested parties. COAH is also directed to reconsider its calculations for reducing prior round obligations based on secondary sources, with specific findings and analysis on the impact that its methodology will have on certain municipalities. If the data and methodology have a rational basis, then COAH remains free to incorporate filtering and other secondary sources into its overall calculation of statewide housing need.

### 4. *Tax credit developments*

COAH reduced the overall statewide prospective housing need figure by 23,077 units derived from the number of affordable units COAH expects will be built in non-COAH certified municipalities between 1999 and 2014 through the Federal Low Income Housing Tax Credit (LITC) Program. *N.J.A.C.* 5:94, Appendix A at 94–44. Fair Share contends that COAH's treatment of tax credit developments will lead to double-counting and is unnecessary because COAH could remove the tax credit reduction from the overall calculation and then credit these developments as they are built. Fair Share also argues that many of the tax credit developments are located in urban aid municipalities that were not required to be certified under the second round, but will be required to obtain certification under the third round growth share approach because

all municipalities have a growth share obligation. COAH responds that the FHA specifically mandates COAH's consideration of other sources of affordable housing in calculating statewide and regional housing need. COAH insists that no municipality will receive a credit for a tax credit development if that municipality was not previously certified, thereby preventing the award of credits for housing that has already been subtracted from statewide and regional need.

In a June 2006 letter, COAH apprised this court of a policy change in the application credits for LITC affordable housing units, as noted in Appendix A to COAH's third round rules. At its June 14, 2006 public meeting, COAH announced that it will permit all municipalities to seek COAH credit for LITC housing, limited by the projection in the third round methodology of the number of LITC units to be built. As discussed in our opinion in *In re Grant of Third Round Substantive Certification to Pennsville Township*, No. A–5998–05T5, 2007 *WL* 177653 (App.Div. Jan. 25, 2006) (slip op. at 5), we construe the June 14, 2006 announcement as an amendment to the third round rules that cannot be accomplished without adherence to the rule-making requirements of the Administrative Procedure Act.[8] This issue, as presented by Fair Share, is moot and the agency treatment of credits for LITC units is thus remanded for rule-making.

## B. *Allocation Issues*

The second category of rules challenged in this appeal concerns the allocation of the present and prospective need for low- and moderate-income housing. In this round, COAH adopts a new approach, which it refers to as growth share. All appellants assert that the COAH version of growth share retreats wholly or in large measure from the constitutional goal of addressing the need for low- and moderate-income housing on a regional basis. Appellant CAHE joins the criticism of the methodology as it

---

[8] *N.J.S.A.* 52:14B–1 to –25.

appears in the challenged rules but urges this court that a pure and unadulterated growth share methodology will satisfy the *Mount Laurel* mandate. To place the various challenges to the allocation methodology in context, we briefly review the methodology used in prior rounds. We then address specific challenged aspects of the growth share approach.

In the first and second rounds, COAH assigned a specific fair share number to every municipality. In doing so, it was following the Court's requirement that municipalities be assigned a specific fair share. *Mount Laurel II, supra,* 92 *N.J.* at 215–16, 222, 257, 456 *A.*2d 390. A fair share number specific to each municipality was "required not because we think scientific accuracy is possible, but because we believe the requirement is most likely to achieve the goals of *Mount Laurel.*" *Id.* at 257, 456 *A.*2d 390. The third round growth share rules take a different approach. The new methodology permits "each municipality to determine its capacity and desire for growth in a way that is consistent with the policies" of the State Plan. *N.J.A.C.* 5:94–1.1(c). In this way, municipalities can decide for themselves how much affordable housing they want in the future.

Appellants CAHE, Fair Share and Builders Association level three criticisms at the growth share approach: (1) *Mount Laurel II* prohibits municipalities from determining themselves the extent to which they wish to create realistic opportunities for the construction of affordable housing; (2) the growth share approach fails to reallocate the excessive number of deficient housing units occupied by low- and moderate-income households in urban areas; and (3) COAH did not implement a true growth share methodology because it did not count jobs created by the rehabilitation of existing underused commercial, retail and office space.

Appellant CAHE, which has urged COAH to adopt a growth share methodology for meeting prospective need, argues that a true growth share approach offers the advantage of simplicity and consistency with the underlying purpose of the *Mount Laurel* doctrine, to ensure that municipalities that elect to grow can

reasonably accommodate the needs of low- and moderate-income households. Nevertheless, CAHE appeals COAH's version of the growth share approach for two reasons: (1) to maximize much needed affordable housing, COAH should require that twenty percent of all new housing be affordable, and (2) it was irrational for COAH to exclude from growth share calculations the job growth that occurs as a result of the redevelopment of existing vacant or underused commercial, industrial or office facilities.

The Municipal Amici supports COAH's growth share rules. They argue that the growth share rules ensure that affordable housing will be constructed as municipalities grow.

1. *Constitutionality of the growth share approach*

The third round rules, specifically, *N.J.A.C.* 5:94–2.1 to –2.5, do not assign a specific number of low- and moderate-income housing units for which a municipality must fashion a housing element that will yield a realistic opportunity of fruition. The rules do provide that the need for affordable housing on a municipal basis is determined by the sum of deficient housing units occupied by low- and moderate-income households (the rehabilitation share), the remaining prior rounds obligation assigned to a municipality, and the share of the affordable housing need generated by a municipality's actual growth (2004–2014) based on the number of new housing units constructed and the number of new jobs created as a result of non-residential development. *N.J.A.C.* 5:94–2.1(a). The "growth share" for a municipality will initially be calculated based on municipal growth projections pursuant to *N.J.A.C.* 5:94–2.2. *N.J.A.C.* 5:94–2.1(d). Section 2.2 directs that the projection of growth share shall rely on the actual number of certificates of occupancy issued since January 1, 2004, the construction and demolition permits issued and projected, the approvals of applications for development, and historic trends within the municipality. *N.J.A.C.* 5:94–2.2(b)(1). An analysis of existing jobs and employment characteristics of the municipality and a projection of future

job creation and future job characteristics are also included. *N.J.A.C.* 5:94–2.2(b)(2).

Once the municipal growth projections are obtained, projections of population and employment growth will be converted into projected growth share affordable housing obligations by applying a ratio of one affordable housing unit for every eight new market-rate residences and one affordable housing unit for every twenty-five newly created jobs. *N.J.A.C.* 5:94–2.1(d). The growth share projections are not converted to an actual growth share obligation until issuance of permanent certificates of occupancy. *Ibid.* Because a municipality's actual growth share obligation is directly linked to the number of housing units that are built in a municipality and the number of jobs generated by non-residential development, each municipality controls its destiny.

Fair Share and Builders Association contend that the Court initially required a specific numerical fair share allocation because voluntary measures had not been effective, *Mount Laurel II, supra,* 92 *N.J.* at 199, 456 *A.2d* 390, and that the Court continues to recognize resistance to inclusion of low- and moderate-income housing. *Toll Bros., supra,* 173 *N.J.* at 540, 803 *A.2d* 53. Consequently, these appellants urge that any allocation mechanism that relies on voluntary compliance is constitutionally flawed.

COAH and CAHE defend the numberless growth share approach of *N.J.A.C.* 5:94–2.1 to –2.5 largely on statements in *Mount Laurel II* that compliance mechanisms should be consistent with sound planning. *Mount Laurel II, supra,* 92 *N.J.* at 238, 456 *A.2d* 390. COAH also urges that the prohibition of zoning exclusively for upper-income or middle-income housing is consistent with the philosophy articulated by the Court that sound planning realistically and practically allows persons of all incomes to live in a town. *Id.* at 211, 456 *A.2d* 390.

Nevertheless, the Court has eschewed an approach based solely on local growth projections. The Court stated:

> While it would be simpler in these cases to calculate a municipality's fair share by determining *its own* probable future population (or some variant thereof), such a

method would not be consistent with the constitutional obligation (although it is a factor that could be considered in a fair share calculation in the absence of other proof). Municipal population projections are based on many factors, but in no case that we know of do they include a value judgment that such municipality should bear its fair share of the region's lower income housing need. In fact, in most cases, we believe, one of the factors necessarily involved in such municipal population projections is the prior and probable future effect of the municipality's exclusionary zoning. If, because of that exclusionary zoning, a suburban municipality with substantial developable land has a very, very small probable growth as shown by the most reliable population projections (resulting in part from its very small past growth caused by exclusionary zoning), it should not be allowed to evade its obligation by basing its fair share of the lower income housing need on that small projected population growth. On the other hand, when that municipality is considered as part of the region and the region's population growth is projected, a value judgment is made, based upon the *Mount Laurel* obligation, that may result in a substantially greater fair share for that municipality and indeed may have the effect of changing what would otherwise be the population projection for that municipality.

[*Id.* at 257–58, 456 A.2d 390.]

The Court has also directed that the " '[n]umberless' resolution of the [municipality's fair share] based upon a conclusion that the ordinance provides a realistic opportunity for *some* low and moderate income housing will be insufficient." *Id.* at 216, 456 *A.2d* 390.

The rules do theoretically constrain municipal discretion to some degree. A municipality's housing element must include municipal population, household and employment growth projections for 2015 as adopted by the State Planning Commission. *N.J.A.C.* 5:94–2.2(b)(4). Those planned projections do not yet exist, however, even though COAH predicted that they would be available in 2005. 36 *N.J.R.* 5762 (December 20, 2004). In lieu of a growth projection issued by the State Planning Commission, a municipality may substitute the most recent municipal population, household and employment growth projections published by the municipality's metropolitan planning organization (MPO). *N.J.A.C.* 5:94–2.2(b)(4).[9]

---

[9] The MPO serving Atlantic, Cape May, Cumberland and Salem counties is the South Jersey Transportation Planning Organization; the MPO serving Burlington, Camden, Gloucester and Mercer counties is the Delaware Valley Regional

If a municipality's housing element contains growth predictions that are inconsistent with planned projections, then the municipality must demonstrate that the planned projections are inaccurate and offer reasons why COAH should accept alternative projections. *N.J.A.C.* 5:94–2.2(b)(5). Municipal growth projections consistent with the planned projections yet to be issued by the State Planning Commission, or alternatively with the MPO's projections, are presumptively valid. *N.J.A.C.* 5:94–2.3(a). If the municipality's planned projections are inconsistent with those other projections, then COAH "may reject the municipality's petition for substantive certification." *N.J.A.C.* 5:94–2.3(b).

There are several significant problems with this approach. COAH issued the growth share rules, and the growth share ratios (one affordable unit for every eight market-rate units and one affordable unit for every twenty-five new jobs), in the absence of any projection from the State Planning Commission that there exists sufficient vacant developable land in the State Plan's Planning Areas 1 and 2 to meet the regional need. COAH does not dispute Builders Association's claim that there must be a rough match between the need defined by COAH and the allocation of that need. COAH arrived at an overall prospective, or growth share, housing need of approximately 52,000 units and then devised the growth share ratios so that anticipated population growth and job growth would meet the growth share need. *N.J.A.C.* 5:94, Appendix A at 94–48. Case law and the FHA require a match between housing need and allocation of that need to municipalities in growth areas. As the Court held in *Mount Laurel II, supra,* 92 *N.J.* at 238–39, 456 *A.*2d 390: "Sound planning requires that municipalities containing 'growth areas' have a *Mount Laurel* obligation and that, together, all of those municipalities affirmatively provide a realistic opportunity for the construction of sufficient lower income housing to meet the needs of New Jersey's lower income population." The FHA directs

Planning Commission; and the MPO serving the North Jersey area is the North Jersey Transportation Planning Authority. *36 N.J.R.* 5762 (December 20, 2004).

COAH to estimate housing need and then adopt criteria and guidelines to allocate the present and prospective fair share of the housing need in a given region. *N.J.S.A.* 52:27D–307(b) and (c)(1). COAH may grant substantive certification only if a municipality's fair share plan is consistent with COAH rules and "not inconsistent with the achievement of the low- and moderate-income housing needs of the region." *N.J.S.A.* 52:27D–314(a).

Before granting substantive certification, COAH must also be assured that the elimination of unnecessary cost-generating features and affirmative measures "make the achievement of the municipality's fair share of low- and moderate-income housing realistically possible." *N.J.S.A.* 52:27D–314(b). The Court has understood the FHA to implement the requirement that the total need be allocated to municipalities. *Hills Dev. Co., supra,* 103 *N.J.* at 22, 510 *A.*2d 621. And in *Township of Warren, supra,* 132 *N.J.* at 35, 622 *A.*2d 1257, the Court described the *Mount Laurel* doctrine as requiring "that local zoning ordinances permit construction within each municipality of affordable-housing units sufficient to provide not only for any local need, but also for a municipality's fair share of the region's need." Indeed, the Court struck COAH's rule allowing occupancy preferences because, collectively, municipalities within a region could not meet the regional need. *Id.* at 35, 39–40, 622 *A.*2d 1257.

The question is whether COAH's growth share methodology violates the mandate of the *Mount Laurel* doctrine and the FHA that any methodology must allocate all of the region's need to the municipalities within the region that have land in a growth area. We conclude that the growth share approach, as presently constituted, is inconsistent with both the *Mount Laurel* doctrine as articulated by the Supreme Court and as codified in the FHA. Builders Association is correct in pointing out that the current growth share approach "pointedly does *not* allocate regional unmet housing need among the municipalities in the region." Prior to implementing a growth share methodology and growth share ratios, COAH must have data from the State Planning Commis-

sion or from some other reputable source that the State as a whole, and that each region within the State, have sufficient vacant developable land within growth areas to enable the ratios to generate enough housing to meet the need. This does not necessarily mean that the entire need must be met within the third round period of substantive certification. Municipalities need not guarantee that the required amount of affordable housing will be built, but must only adopt land use ordinances that create a realistic opportunity to meet the regional need and their own rehabilitation share.

According to COAH, as of 2000, the State contained approximately two million acres of vacant land. *N.J.A.C.* 5:94, Appendix A at 94–32. Most of that land is in Planning Areas 4 and 5, which generally are areas for conservation (1,341,694 acres out of a total of 1,915,032 acres). *Ibid.* We can assume that there is some vacant land in areas designated as "centers" in Planning Areas 4 and 5, where growth is intended, but the amount is unknown. In addition, as Builders Association points out, significant amounts of land cannot be developed because of legislation such as the Pinelands Act and the recently enacted Highlands Water Protection and Planning Act, *N.J.S.A.* 13:20–1 to –35.[10] COAH does not know the amount of vacant developable land located within growth area municipalities because the State Planning Commission has not issued that information. Without that basic knowledge, COAH cannot reasonably assume that its growth share methodology will provide a realistic opportunity to meet the statewide and regional need.

We conclude that the growth share methodology can be valid only if COAH has data from which it can reasonably conclude that the allocation formula can result in satisfaction of the statewide need. A significant mismatch between need and remaining vacant developable land would require COAH to either change the

---

[10] A draft master plan for the Highlands Region was promulgated on November 30, 2006.

growth share ratio or to devise a different method for allocating the need.

In addition, the growth share approach encourages municipalities to adopt master plans and zoning ordinances that retard growth, in order to minimize the municipality's fair share allocation. CAHE summarizes the problem as follows: "Under growth share, a municipality determines where and how much it will grow, knowing that if it chooses to grow, it has an obligation to provide affordable housing as part of the growth." CAHE reasons that because growth share depends upon planning decisions made voluntarily at the local government level, the methodology "should encourage a greater degree of voluntary compliance." However, as pointed out in comments to COAH, prior experience "has documented that if permitted to do so, municipalities are likely to utilize methodologies that are self-serving and calculated to minimize municipal housing obligations." 36 *N.J.R.* 5761 (December 20, 2004). The Court has recognized that municipalities will adopt land use regulations to minimize affordable housing obligations if permitted to do so. *Toll Bros., supra,* 173 *N.J.* at 567, 803 *A.*2d 53; *Mount Laurel II, supra,* 92 *N.J.* at 198–99, 456 *A.*2d 390. That is why the Court rejected the "simpler" approach of allocating a municipality's fair share based on the municipality's own growth projections. *Mount Laurel II, supra,* 92 *N.J.* at 257–58, 456 *A.*2d 390.

COAH argues that its regulations promoting consistency between municipal housing elements and the State Plan (*N.J.A.C.* 5:94–2.2 and –2.3) make it more difficult for municipalities to unilaterally control whether they grow, and therefore, whether they will incur a growth share obligation. However, as COAH itself acknowledges, the State Planning Commission determines the growth areas in the State Plan in large part on the basis of municipal planning documents. The State Planning Commission derives growth projections "through a negotiated process between the municipality, the county and the State." 36 *N.J.R.* 5762. Under the exceedingly complex regulations adopted by the State

Planning Commission, *N.J.A.C.* 5:85–1.1 to –8.7, cross-acceptance is defined as the "process of comparing planning policies among government levels with the purpose of obtaining consistency between municipal, county, regional, and State plans and the State Development and Redevelopment Plan." *N.J.A.C.* 5:85–1.4. Municipalities participate in the negotiating process by providing copies of their master plans, zoning ordinances, and other related information. *N.J.A.C.* 5:85–3.6(a)(1). The purpose of plan endorsement is to increase the degree of consistency between the State Plan and municipal, county, regional or State agency plans. *N.J.A.C.* 5:85–7.1(b). We agree with appellants that under the growth share approach currently embodied in the COAH regulations, a municipality may control its destiny by adopting measures to discourage or retard residential and non-residential development, simply by "downsizing" remaining developable land.

Any growth share approach must place some check on municipal discretion. The rules, as they currently exist, permit municipalities with substantial amounts of vacant developable land and access to job opportunities in nearby municipalities to adopt master plans and zoning ordinances that allow for little growth, and thereby a small fair share obligation. The regulations encouraging municipal consistency with the State Plan do not address the problem because of the circularity of the process. The State planning designations depend in large part on municipal land use decision-making. If municipalities with substantial amounts of vacant land and access to infrastructure can decide for themselves whether and how much to grow, it is highly likely that housing opportunity will fall far short of identified housing need. Therefore, the current growth share approach violates both the *Mount Laurel* doctrine and the FHA.

### 2. *Elimination of reallocated present need*

COAH adopted reallocated present need as an allocation factor in the first and second rounds. *AMG Realty, supra,* 207 *N.J.Super.* at 401, 504 *A.*2d 692; *N.J.A.C.* 5:92, Appendix A at 92–48;

*N.J.A.C.* 5:93, Appendix A at 93–52. The second round rules define reallocated present need as "the share of excess deterioration in a region transferred to all communities of the region with the exception of selected Urban Aid Cities." *N.J.A.C.* 5:93, Appendix A at 93–52. The rationale for the reallocation is that "certain municipalities, even though located in areas characterized as growth in the SDGP, have an indigenous need which far exceeds their fair share. They should not be expected to provide decent housing for a disproportionate share of the need." *AMG Realty, supra,* 207 *N.J.Super.* at 401, 504 *A.*2d 692 (citing *Mount Laurel II, supra,* 92 *N.J.* at 243, 456 *A.*2d 390).

The third round rules do not reallocate existing need from municipalities with a disproportionate number of dilapidated units to other growth area municipalities within the region because the growth share approach allocates need based on actual development. *N.J.A.C.* 5:94, Appendix A at 94–35. "Reallocated Present Need is not present in Round 3 as it is inconsistent with a Growth Share approach, which provides for regional need to be met as a proportion of residential and employment growth in the region." *Ibid.* At issue here is whether COAH's treatment of reallocated present need violates the *Mount Laurel* doctrine or the FHA. This is a close question, but we conclude that the FHA does not expressly require COAH to reallocate present need.

The FHA does not expressly require COAH to reallocate the excess present need existing in poor urban municipalities. COAH's mission is to adopt "criteria and guidelines" to enable municipalities to determine their "present and prospective fair share of the housing need in a given region." *N.J.S.A.* 52:27D–307c(1). Nor does *Mount Laurel II* expressly require reallocation of present need, although that obligation can be fairly implied from the Court's opinion. In holding that every municipality must adopt land use regulations to provide a realistic opportunity for sound housing for the resident poor, the Court stated: "In other words, each municipality must provide a realistic opportunity for decent housing for its indigenous poor except where they repre-

sent a disproportionately large segment of the population as compared with the rest of the region. This is the case in many of our urban areas." *Mount Laurel II, supra,* 92 *N.J.* at 214–15, 456 *A.*2d 390. The Court elaborated as follows:

As noted before, *all* municipalities' land use regulations will be required to provide a realistic opportunity for the construction of their fair share of the region's present lower income housing need generated by present dilapidated or overcrowded lower income units, including their own. Municipalities located in "growth areas" may, of course, have an obligation to meet the present need of the region that goes far beyond that generated in the municipality itself; there may be some municipalities, however, in growth areas where the portion of the region's present need generated by that municipality far exceeds the municipality's fair share. The portion of the region's present need that must be addressed by municipalities in growth areas will depend, then, on conventional fair share analysis, some municipality's fair share being more than the present need generated within the municipality and in some cases less.

[*Id.* at 243–44, 456 *A.*2d 390.]

Judge Serpentelli interpreted the above-quoted passage as requiring a methodology that reallocates present need from inner cities to developing suburbs. Municipalities with an excess of dilapidated housing occupied by the poor "should not be expected to provide decent housing for a disproportionate share of the need." *AMG Realty, supra,* 207 *N.J.Super.* at 401, 504 *A.*2d 692. Therefore, after determining the total regional housing stock and calculating what percentage of that total constitutes substandard housing, "any municipality whose indigenous need in relationship to its housing stock is in excess of that regional percentage, will have its excess assigned to a reallocation pool. This pool will be distributed to all municipalities which contain any area designated as growth in the SDGP," excluding certain municipalities receiving urban aid. *Ibid.* Judge Serpentelli added:

The effort to remove from the pool all units which can be rehabilitated fails for two reasons. First, there is no reason to believe that the urban aid towns which contain the vast majority of present need that must be reallocated, have the capacity to repair the physically deficient units. As mentioned, the ability of those municipalities to undertake substantial rehabilitation has decreased in recent years due to the paucity of governmental subsidies. Second, the approach taken by defendant's experts is fundamentally unfair because it places on the urban poor municipalities an obligation beyond their fair share of their indigenous need. *Mount Laurel* goes the other way and relieves the core cities of that obligation.

[*Id.* at 422, 504 *A.*2d 692 (citing *Mount Laurel II,* 92 *N.J.* at 243, 456 *A.*2d 390).]

The first round rules estimated that about fifteen percent of the total statewide need (without considering secondary sources) represented reallocated present need (34,411 units out of a total need of 199,966 units). *N.J.A.C.* 5:92, Appendix A at 92–46 and 92–48. Round two reduced the estimated reallocated present need to 17,542 units. *N.J.A.C.* 5:93, Appendix A at 93–47 and 93–52.

In adopting the third round rules, COAH characterized reallocated present need as the "replacement of a primarily urban rehabilitation obligation with a primarily suburban New Construction Obligation." 36 *N.J.R.* 5790 (December 20, 2004). COAH identified two undesirable results created by the round one and round two methodology: (1) it substantially increased the new construction obligation of many municipalities that had their own substantial rehabilitation obligations; and (2) older, suburban communities that were already built up were assigned a substantial new construction obligation that could not be met; municipalities lacking vacant land could not develop a "realistic" fair share plan because the new construction obligation could not realistically be satisfied without any land to build new housing. *Ibid.* COAH also estimated that housing need in the inner cities was slightly below what it was in round two, and COAH would also require that vacant rental rehabilitation units be affirmatively marketed within the region. *Ibid.*

We conclude that the *Mount Laurel* doctrine does not necessarily require COAH to allocate excess housing need existing in the inner cities to suburban municipalities. Not only does the regulation of any administrative agency carry a presumption of validity, but the Court has signaled its intent to allow COAH broad discretion in implementing the *Mount Laurel* doctrine. *Hills Dev. Co., supra,* 103 *N.J.* at 21, 51, 510 *A.*2d 621. We have previously concluded that a growth share approach could be constitutional under existing Supreme Court precedent if: (1) COAH has accurate data that there is sufficient vacant developable land in growth areas to meet the identified housing need, and

(2) municipalities with vacant developable land in growth areas cannot avoid their fair share obligation by deciding for themselves whether they will grow. Reallocating present need from inner cities to other municipalities is fundamentally inconsistent with a constitutional growth share methodology; it suggests that the excess need in inner cities must be specifically reassigned to other municipalities.

This court should defer to COAH's experience in administering the round one and round two rules, which show that reallocating present need was not a practical solution to the lack of affordable housing in suburban growth areas because: (1) so many suburbs already had to address significant housing deterioration, and (2) so much of the reallocated present need was assigned to suburban municipalities that lacked sufficient vacant developable land. The Court has stated: "Revisions, adjustments, fine tuning—all of the techniques available to an administrative agency—can be implemented on a statewide basis as experience teaches [COAH] what works and what does not." *Id.* at 37, 510 *A.*2d 621. If, as COAH predicts, a growth share approach will actually result in the construction of more affordable housing, then we do not believe that excess present need in urban municipalities must be reallocated to other municipalities.

We disagree with appellants that eliminating reallocated present need unfairly burdens inner cities. If most of the new jobs and new housing in the State do not occur in distressed inner cities, then affirmatively marketing the housing that does become available in suburban growth areas will not require cities to tax their limited sources by providing affordable housing. If, on the other hand, job growth and new housing development does take place in the inner cities, then those municipalities will have greater resources to meet the housing needs of the poor.

### 3. *Calculating a municipality's allocated fair share; measuring actual housing growth and job growth*

The growth share methodology is based on the premise that municipalities that add jobs and housing between 2004 and 2014

should also accommodate their fair share of the statewide and regional need for affordable housing. Municipalities must take measures to credit one affordable housing unit for every eight market-rate units and for every twenty-five new jobs. *N.J.A.C.* 5:94-2.1(d). Appellants attack COAH's methodology for calculating the job growth and the housing growth that must be allocated to a municipality. They claim it is arbitrary, unreasonable and inconsistent with the overall philosophy underlying growth share for COAH to: (1) exclude the growth that occurs as a result of redevelopment; (2) calculate job growth based on the use group and square footage of a new, non-residential structure; (3) determine net growth by allowing municipalities to subtract demolished housing units from their overall growth; and (4) exempt some inclusionary developments that have less than a twenty percent set-aside, provided that the municipality offers a rational basis for excluding those lower set-aside developments.

We conclude that COAH has offered no sound reason for excluding new jobs that are added as a result of redevelopment and that the use of square footage based on use groups has the potential to be arbitrary. On the other hand, COAH has not acted unreasonably in subtracting demolitions from new certificates of occupancy or in exempting from the growth share calculation some inclusionary developments with less than a twenty percent set-aside.

a. *Rehabilitation and redevelopment*

For the third round, COAH anticipates that about fifty percent of the 52,747 units of new affordable housing will be met by net job growth. *N.J.A.C.* 5:94, Appendix A at 94-47 to -49. COAH estimates that between 2004 and 2014 the State will add 679,302 jobs. *Id.* at 94-48. A growth share allocation of one new housing unit for every twenty-five new jobs will result in an obligation to produce a total of 27,172 new housing units. *Id.* at 94-48 to 94-49.

COAH calculates job growth based on new construction; jobs that are created as a result of the rehabilitation of a vacant building do not add to a municipality's growth share. Moreover, vacant, non-residential structures that are demolished produce a reduction from the new jobs calculation. COAH's handbook explains that the non-residential growth share obligation is calculated based on the net increase of square footage of non-residential development. New Jersey Council on Affordable Housing, *The COAH Handbook, Your Guide to Navigating the Third Round Rules* 31 (2006) (*COAH Handbook*). Thus, the rehabilitation of a vacant office building that currently provides no jobs will not generate a growth share obligation. Similarly, if that vacant building is demolished and a new building of the same size replaces it, the net employment growth share obligation is zero. *Ibid.*

As observed by appellants, the result of this decision is to permit municipalities that experience substantial job growth to avoid any growth share obligation. The following hypothetical illustrates the problem. Office buildings are in use group B, which, under *N.J.A.C.* 5:94, Appendix B, generates three jobs for every 1000 square feet or one affordable unit for every 8333 square feet. Assume a municipality has two vacant 100,000 square foot office buildings. Each of these office buildings would be expected to accommodate 300 jobs, leading to a growth share obligation of twelve affordable units. Assume a developer demolishes one of the two 100,000 square foot office buildings and renovates the other office building, which thereby creates a net increase of 300 jobs, which would ordinarily lead to a fair share obligation of twelve affordable units. However, the municipality incurs no growth share obligation because the new jobs are being created in a renovated office building.

In addition, in this example, the demolition of the other 100,000 square foot office building gives the municipality a credit of twelve affordable units against any other non-residential development that occurs within the municipality. If the municipality permitted

the construction of a third 100,000 square foot office building on some other site it would be permitted to net the demolition against the new construction. Thus, a municipality would have a zero growth share obligation even though it experienced a net increase of 600 jobs. This situation results from applying *N.J.A.C.* 5:94–2.4(b)(1), which requires a municipality to plan for one affordable housing unit for every twenty-five newly created jobs, "as measured by new or expanded non-residential construction within the municipality." However, the non-residential growth share obligation shall not go below zero, and non-residential demolitions and any resulting job loss shall not be applied as a credit against the residential growth share. *Ibid.*

Appellants contend that the methodology selected by COAH significantly understates actual job growth. They argue that a valid growth share methodology requires that an affordable housing obligation be allocated to a municipality that experiences real growth in jobs. They point out, and COAH does not dispute, that there is an abundance of existing vacant office and retail space in the State, and municipalities that experience actual job growth should also be required to provide their fair share of affordable housing to meet the need generated by that job growth.

COAH defends its decision on the ground that the existing vacancy level in non-residential buildings in the State does not appreciably affect housing need. But COAH does not explain why the housing need generated by real growth should not be allocated to municipalities that experience job growth.

COAH offered a more relevant defense in its response to a comment regarding demolitions:

> [COAH] has found that demolitions are the best indicator for job loss. To decrease a growth share obligation based on loss of jobs without the decrease of square footage would require the use of a different data source, which is not available at the municipal level for specific sites. [COAH]'s intent is to use a uniform and consistent data source to determine municipal growth share obligations.
>
> New Jersey Department of Labor and Workforce Development statistics, the only alternative to construction data, were not found to be the best indicator of job growth for purposes of calculating job growth at the municipal level because they

are not updated as frequently as construction data. There is also an inherent problem with the data because it is address-based and not municipality-based. This results in buildings being located in one municipality but the addresses carrying the zip code of an adjacent municipality, resulting in jobs being attributed to the wrong municipality. Use of construction data is more accurate and is also consistent with [COAH]'s mission to address that segment of the need related to municipal land-use practices. In addition, while occupied non-residential space that experiences job loss will not trigger a growth share reduction, neither will job increases in existing space trigger an increased growth calculation.

[36 *N.J.R.* 5767–68.]

Regarding redevelopment, we conclude that the rationale offered in response to comments is insufficient to support COAH's decision to exempt redevelopment from a municipality's growth share allocation. As COAH has stated, the growth share "methodology is based on the principle that affordable housing should be provided wherever growth occurs." 36 *N.J.R.* 5765. Further, growth share "is predicated on the premise that all development provides employment, and, therefore, generates a corresponding need for affordable housing and must, therefore, be included in growth share." *Ibid.* Individual rules must be consistent with COAH's overall fair share methodology. *Twp. of Warren, supra,* 132 *N.J.* at 39, 622 *A.*2d 1257. The rehabilitation of vacant properties results in real growth, so exclusion of that growth from the growth share equation is *not* consistent with COAH's overall fair share methodology.

COAH acknowledges that job data can be secured from Department of Labor statistics, and ISP persuasively argues that municipalities regularly require certificates of occupancy when developers renovate existing vacant space. Yet the *COAH Handbook* informs municipalities that they may not provide actual data on the number of jobs created by a particular non-residential development, and then substitute that data for the use group calculations provided in Appendix E of *N.J.A.C.* 5:94. Instead, non-residential growth is measured by the job generator calculations of Appendix E of the third round rules. *COAH Handbook, supra,* at 27. But if municipalities are willing and apparently able to provide the necessary data, then COAH will have a more accurate calculation of real growth. Municipalities must submit annual

monitoring reports containing very detailed information reflecting housing growth and job growth. *N.J.A.C.* 5:94–2.5; *N.J.A.C.* 5:94–9.2. Actual job growth can be included in those reports.

We conclude that *N.J.A.C.* 5:94–2.4 is invalid to the extent that it relies exclusively on net new construction minus demolitions in computing growth share. The rule, as it currently stands, is inconsistent with the stated purpose of the methodology to correlate municipal affordable housing obligations with actual growth, and exclusive reliance on the use of group computations in Appendix E can produce results that do not fairly measure employment growth.

b. *Growth share obligations resulting from inclusionary developments—the rational basis standard*

■ Fair Share challenges the validity of *N.J.A.C.* 5:94–2.4(a)(4), which states the general rule that most inclusionary developments will not generate a growth share obligation, but that some inclusionary developments with a lower percentage of affordable housing may generate some growth share obligation. Objections were raised to the rational basis standard. Objectors, including Fair Share, contended the test was a meaningless and unpredictable standard. The rule, *N.J.A.C.* 5:94–2.4(a)(4), however, has been amended to delete the rational basis standard and to refer instead to guidelines established in two second round rules. As adopted, the rule provides:

Market-rate units in an inclusionary or mixed-use development that received credit in a first or second round certified plan or a court judgment of compliance or are eligible for credit pursuant to *N.J.A.C.* 5:93 toward a municipality's prior round obligation, that are projected to be constructed after January 1, 2004 shall be excluded from residential growth for the purposes of projecting the growth share, provided these sites are zoned without conditions to produce affordable housing units. [COAH] shall assume, for crediting purposes, that market-rate units are constructed at a rate of four times the number of affordable units (this is a 20 percent set-aside) constructed on that particular site, unless the municipality demonstrates to [COAH] that a lower set-aside percentage was used to produce the affordable units using the gross density and set-aside standards pursuant to *N.J.A.C.* 5:93–5.6 or the set-aside standards for constructing affordable rental units pursuant to *N.J.A.C.* 5:93–5.15. A municipality shall not receive an exclusion of

market-rate units from residential growth at a rate about 5.67 times the number of affordable units (this is a 15 percent set-aside) constructed on that particular site. [*N.J.A.C.* 5:94–2.4(a)(4).]

Due to the amendment, the challenge to the rational basis standard is moot. The two second round rules cited by COAH in the regulation quoted above recognize that certain types of inclusionary developments are more expensive and, therefore, warrant a set-aside of less than twenty percent. Specifically, inclusionary developments consisting of single-family detached developments or rental units require a deeper developer subsidy. Accordingly, COAH requires a set-aside percentage of only fifteen percent rather than the twenty percent standard that presumptively applies in townhouse sales (that is, non-rental) developments. *N.J.A.C.* 5:93–5.6(b)(2) (single-family detached developments); *N.J.A.C.* 5:93–5.15(c)(5) (rental housing). *N.J.A.C.* 5:94–2.4(a)(4), as amended, represents a policy decision that inclusionary developments that require a deeper subsidy should not trigger a growth share obligation. The regulation is a reasonable exercise of COAH's statutory authority.

## C. *Compliance Mechanisms*

After a municipality calculates its allocated fair share of the region's need, it must develop a fair share plan "that meets the requirements of this subchapter to address the municipality's total 1987–2014 fair share obligation, including implementing ordinances designed to ensure that the fair share of affordable housing for the 1987–2014 period is met." *N.J.A.C.* 5:94–4.1(a). The FHA allows a municipality to comply with its *Mount Laurel* obligation "by means of any technique or combination of techniques which provide a realistic opportunity for the provision of the fair share." *N.J.S.A.* 52:27D–311(a).

Appellants challenge the validity of a number of compliance mechanisms sanctioned either by the FHA or by the third round rules or both. These include allowing municipalities: (1) to require developers to pay for the cost of affordable housing without any offsetting benefits; (2) to age-restrict fifty percent of the

affordable units to be built within the municipality; (3) to gain credits for producing rental housing in excess of the twenty-five percent minimum; (4) to send the municipality's obligation to another municipality through an RCA; and (5) to gain credits for extending affordability controls on existing affordable housing. In addition, Builders Association argues that the mandatory set-asides and payments in lieu provisions of COAH's rules are invalid. Amicus NAIOP supports this argument.

1. *Obligations without incentives and in lieu payments*

Under the third round rules, every municipality has an obligation to facilitate the construction of one affordable unit for every eight new housing units and every twenty-five jobs. *N.J.A.C.* 5:94–4.1(c). However, municipalities may achieve compliance by adopting land use ordinances that require a developer to provide one unit of affordable housing for every eight market-rate units, or one unit of affordable housing for every twenty-five jobs created in a non-residential development. *N.J.A.C.* 5:94–4.4(a). The zoning ordinance "shall require a developer to construct the affordable units on site or elsewhere in the municipality or, alternatively, allow the option of a payment in lieu of constructing the units on site." *N.J.A.C.* 5:94–4.4(b). The regulations establish no standards for in lieu fees; instead, "[t]he amount of payments in lieu of constructing affordable units on site shall be negotiated between the municipality and the developer." *N.J.A.C.* 5:94–4.4(c).

Developers who build affordable housing or pay a fee in lieu thereof are exempt from development fees, which are one percent of the equalized assessed value for residential developments and two percent of the equalized assessed value for non-residential developments. *N.J.A.C.* 5:94–4.4(b). *See N.J.A.C.* 5:94–6.6 and –6.7. Money collected from developers making payments in lieu of constructing affordable housing must be deposited in a housing trust fund account and "shall at all times be identifiable from development fees." *N.J.A.C.* 5:94–4.4(e). The municipality must "take into consideration the economic feasibility of such zoning."

*N.J.A.C.* 5:94–4.4(a). However, the rules do not establish any standards that municipalities must consider in assessing the economic feasibility of a zoning ordinance requiring developers to construct affordable housing without compensating benefits.

COAH received a number of comments and questions on its rule that permitted municipalities to compel developers to construct affordable housing without compensating benefits. One commenter argued that COAH's "failure to provide standards for municipalities that zone for rental housing will result in disputes between municipalities and developers and add to the length of the review process that has already become interminable." 36 *N.J.R.* 5772 (December 20, 2004). COAH responded:

> [COAH] does not believe it is appropriate to require a site-specific minimum or maximum affordable housing set-aside or density in the third round proposal. The municipality is responsible for submitting a plan that meets its overall affordable housing obligation, as set forth in *N.J.A.C.* 5:94–2.4. Therefore, it is a municipality's responsibility to offer incentives to create a realistic opportunity for the production of rental housing. [COAH] does not believe this will result in a delay in the production of affordable housing.
>
> [*Ibid.*]

Another commenter opined that the lack of standards for inclusionary developments and in lieu fees "coupled with the knowledge that no development equals no housing obligation will reduce the amount of affordable housing that will be constructed and the in-lieu fees that will be collected." *Id.* at 5773. COAH responded:

> [COAH] disagrees with the commenter that the reproposed rule will devalue land or force a build/no-build decision. [COAH] believes its rules provide adequate standards for inclusionary developments and payments in lieu. Payments in lieu of constructing affordable housing have always been an option that some municipalities provide to developers in their zoning ordinance. [COAH] has never set a standard for the amount of a payment in lieu of constructing affordable housing. The amount has always been negotiated between the municipality and the developer, and [COAH] encourages municipalities to negotiate the true cost of constructing an affordable housing unit within the municipality.
>
> [*Ibid.*]

COAH also clarified that: (1) municipalities may require builders of commercial, office or industrial properties to build on-site affordable housing, even in a non-residential zone; (2) developments that do not provide affordable housing or an in lieu fee may

be subject to a development fee; and (3) payments in lieu must be used for development of affordable housing within the municipality, and not to fund an RCA. *Id.* at 5773–74.

Builders Association contends that the rules are unconstitutional on two grounds: (1) they authorize a taking of private property for private use without just compensation, and (2) they violate principles of substantive due process in that they are not rationally related to a legitimate public purpose. Builders Association's non-constitutional arguments focus on the absence of standards and the chilling effect that ordinances enacted pursuant to the rules will have on the actual production of affordable housing. Builders Association contends that *Mount Laurel II* and its progeny demand that zoning ordinances create a realistic opportunity, not disincentives, for the construction of affordable housing. NAIOP limits its amicus participation to this issue, also asserting constitutional and non-constitutional arguments. We address first whether these provisions are consistent with the *Mount Laurel* doctrine.

We conclude that any rule that permits municipalities to compel on-site affordable housing or payments in lieu thereof without any compensating benefits violates the fundamental principle of the *Mount Laurel* doctrine that ordinances create a realistic opportunity for the construction of the region's need for affordable housing. Furthermore, *N.J.A.C.* 5:94–4.4 establishes no standards to govern the amount of any fee assessed in lieu of construction of the required affordable unit, a practice that the Supreme Court and this court has criticized and condemned. First, we address the fee in lieu provisions.

The Court addressed the statutory and constitutional authority of affordable housing development fees as a condition of development approval in *Holmdel Builders Ass'n v. Township of Holmdel*, 121 *N.J.* 550, 583 *A.*2d 277 (1990). The Court found that the FHA did not expressly authorize development fees, but the use of such fees could readily be implied due to the broad powers bestowed on COAH by the Legislature through the FHA. *Id.* at

573–74, 583 *A.2d* 277. The Court found, however, that the use of these fees must be preceded by the promulgation of rules that provide standards and guidelines for the imposition and use of the fees. *Id.* at 579–80, 583 *A.2d* 277. As to those standards, Justice Handler directed:

> Regulatory standards will enable us to determine that persons subject to such ordinances have been reasonably informed of their obligations, and that both municipalities and COAH in the adoption and approval of such ordinances are acting in conformity with the legislative intent of the FHA.
>
> Such regulations will define more precisely the impact and effect of development fees. They presumably will address the types of developments that will be subject to fees, the amount and nature of the fees imposed, the relationship of fees to other inclusionary-zoning measures such as mandatory set-asides and density bonuses. . . .
>
> [*Ibid.*]

Similarly, in the context of ordinances that authorize payments by developers for off-site improvements, those ordinances must establish fair and reasonable standards to determine the fee, and the fee must bear a rational nexus to the need created by the development. *N.J.S.A.* 40:55D–42. Thus, when the amount assessed per unit bore the earmarks of an auction to the highest bidder, a site plan approval obtained on condition of a contribution to an affordable housing plan was set aside. *Nunziato v. Planning Bd. of Edgewater*, 225 *N.J.Super.* 124, 133–34, 541 *A.2d* 1105 (App.Div.1988); *cf. Britwood Urban Renewal, LLC v. City of Asbury Park*, 376 *N.J.Super.* 552, 570, 871 *A.2d* 129 (App.Div. 2005) (ordinance granting broad discretion to the City Engineer to determine the appropriate level of contributions toward off-site infrastructure improvements questioned).

Here, *N.J.A.C.* 5:94–4.4(c) expressly provides that "the amount of payments in lieu of constructing affordable units on site shall be negotiated between the municipality and the developer." No standards or guidelines are provided to guide these negotiations.

The impact of the lack of standards or guidelines is demonstrated by appellants. Builders Association has provided an ordinance from one municipality in Ocean County, which has determined that it will charge builders $150,000 for each affordable unit. NAIOP

encloses other payment in lieu ordinances from municipalities throughout the State that require what NAIOP characterizes as ranging from "the very reasonable demand of $35,000 up to the unconscionable demand of $466 per square foot per unit."

Substantial and unpredictable monetary contributions deter rather than encourage the construction of affordable housing and are contrary to law. In the absence of standards to guide the formulation of municipal ordinances, payments in lieu cannot be utilized.[11]

We next address the requirement to build affordable housing units without incentives. At the core of the *Mount Laurel* doctrine is the requirement that municipalities create a *realistic* opportunity for the construction of its fair share of affordable housing. *Mount Laurel II, supra,* 92 *N.J.* at 221, 456 *A.*2d 390. "[W]hether the opportunity is 'realistic' will depend on whether there is in fact a likelihood—to the extent economic conditions allow—that the lower income housing will actually be constructed." *Id.* at 221–22, 456 *A.*2d 390. "Satisfaction of the *Mount Laurel* doctrine cannot depend on the inclination of developers to help the poor. It has to depend on affirmative inducements to make the opportunity real." *Id.* at 261, 456 *A.*2d 390. An opportunity is "realistic" if it is "at least sensible for someone to use." *Ibid.*

Indeed, the third round rules define "realistic opportunity" as "a reasonable likelihood that the affordable housing in a municipality's Housing Element and Fair Share Plan will actually be constructed or provided ... upon a careful analysis of the elements in the municipality's plan, including the financial feasibility as set forth in *N.J.A.C.* 5:94–4.2(a) and the suitability of specific sites as set forth in *N.J.A.C.* 5:94–4.5." *N.J.A.C.* 5:94–1.4. Trial courts

---

[11] On December 13, 2006, COAH announced several proposed amendments to the third round rules. COAH has proposed an amendment to *N.J.A.C.* 5:94–4.4 that establishes a purported "clear standard" for calculation of in lieu payments. We express no opinion about the validity of the proposed amendment.

administering the *Mount Laurel* doctrine have insisted on higher densities, removal of excessive restrictions and exactions, and realistic set-asides to ensure that municipalities adopt zoning ordinances that made the opportunity realistic. *AMG Realty, supra,* 207 *N.J.Super.* at 443–47, 504 *A.*2d 692. As Judge Serpentelli explained:

> For a mandatory set aside to be effective, the set aside must be reasonable and the unit density must be reasonable. If the set aside is reasonable and the density is reasonable, actual construction will result. If the set aside is too high or the density too low, no construction will occur because the project must be profitable.
>
> [*Id.* at 446, 504 *A.*2d 692.]

The FHA authorizes COAH to grant substantive certification only if the municipality's zoning ordinance eliminates cost-generating features and provides those affirmative measures in the housing element and fair share plan necessary to make it realistically possible for the municipality to meet its fair share. *N.J.S.A.* 52:27D–314(b). In drafting the housing element and fair share plan, the municipality must consider: "[r]ezoning for densities necessary to assure the economic viability of any inclusionary developments, either through mandatory set-asides or density bonuses, as may be necessary to meet all or part of the municipality's fair share." *N.J.S.A.* 52:27D–311(a)(1).

COAH's first and second round rules ensured that opportunities be realistic in a number of ways. In reviewing municipal fair share plans, COAH would examine "the need for a density bonus in order to produce low and moderate income housing." *N.J.A.C.* 5:93–5.6(b). For single-family developments with an inclusionary component, COAH established a presumptive density of four units per acre and a fifteen percent set-aside. *N.J.A.C.* 5:93–5.6(b)(2). Municipalities could also zone for six units per acre at a twenty percent set-aside, *ibid.,* and COAH could require higher densities when it determined that they were necessary "to provide an opportunity for inclusionary development in a specific municipality, based on the particular circumstances of that municipality." *N.J.A.C.* 5:93–5.6(c)(2). For rental housing COAH established a

presumptive set-aside of fifteen percent and a presumptive density of ten units per acre. *N.J.A.C.* 5:93–5.15(c)(5).

In *Toll Bros., supra,* 173 *N.J.* at 554, 803 *A.*2d 53, the Court recognized the importance of proper incentives in upholding a judgment invalidating a municipality's *Mount Laurel* ordinance because the types of inclusionary housing permitted under the ordinance were not responsive to current market demand. The Court reasoned:

> Our case law, the FHA, and COAH all recognize that the realistic opportunity evaluation cannot be made in a theoretical vacuum. Zoning for affordable housing that cannot or will not be built by private developers does not satisfy a municipality's *Mount Laurel* obligation. To state the obvious, developers are motivated by profit, and there is likely no greater area of concern for a developer than the marketability of its project. The colloquial phrase "if you build it, they will come" does not translate well to the building of homes. The realities in our market system must be a critical factor in the application of *Mount Laurel* mandates. [*Ibid.*]

We conclude that the *Mount Laurel* doctrine, as articulated in *Mount Laurel II* and *Toll Bros.,* and as codified by the FHA, requires municipalities to provide incentives to developers to construct affordable housing. Land use ordinances requiring all developers to provide some affordable housing conflict with the essence of the *Mount Laurel* doctrine, which requires that municipal land use ordinances create a realistic opportunity. *N.J.A.C.* 5:94–4.4 discourages development, even in growth areas where development is supposed to occur because it makes development both more expensive and less predictable. The rules allow municipalities in growth areas to discourage development of any kind, and therefore the development of any affordable housing, by zoning selected areas for uncompensated inclusionary development, or by negotiating fees unguided by any standards.

History has shown that many municipalities believe that it is in their best financial interest to exclude low- and moderate-income households, especially households with children. *Toll Bros., supra,* 173 *N.J.* at 540, 803 *A.*2d 53; *Mount Laurel I, supra,* 67 *N.J.* at 171, 336 *A.*2d 713. Permitting municipalities to demand that developers build affordable housing without any additional incen-

tives provides municipalities with an effective tool to exclude the poor by combining an affordable housing requirement with large-lot zoning and excessive demands for compensating fees in lieu of providing such housing. Under *N.J.A.C.* 5:94–4.4, municipalities need not consider the economic feasibility of complying with the ordinance. Yet, this is counter to the very definition of realistic opportunity adopted by COAH. Economics get factored into the equation only when the municipality exercises its right to require a developer to provide more than one affordable unit for every eight market-rate units or more than one unit for every twenty-five jobs. *N.J.A.C.* 5:94–4.4(a). A regulatory regime that relies on developers to incur the uncompensated expense of providing affordable housing is unlikely to result in municipal zoning ordinances that make it realistically probable that the statewide need for affordable housing can be met.

Throughout this opinion, we have referred to the considerable discretion reposed in the agency to discharge its constitutional mission. We have also noted the Court's skepticism that affordable housing units will be produced by private sources without incentives. This record is lacking in any experiential or theoretical support for the agency conclusion that affordable housing units will be constructed during the 2004–2014 period in the numbers that are required to satisfy the constitutional imperative of providing affordable housing in this State.

Furthermore, the rules' impact is not limited to developers. Households with incomes only slightly higher than those who qualify as low- or moderate-income will also be affected. Developers who go uncompensated for providing housing for the poor must charge more for market-rate housing, which will inevitably drive up the cost of housing that would otherwise be affordable to the near poor. The Law Division has already held that "such zoning is discriminatory and unfair." *Van Dalen, supra,* 205 *N.J.Super.* at 343, 500 *A.*2d 776. The government's interest in providing housing affordable to those at or below the eighty percent threshold "may not be pursued by means which impose an

excessive and unfair burden upon middle income households when there are other suitable means of achieving this objective." *Id.* at 344, 500 *A.2d* 776. Because the rules place no limit on a municipality's right to compel uncompensated exactions from developers of middle-income housing, they unnecessarily drive up the already high cost of housing for the near poor. As such, the rules frustrate, rather than further, a realistic opportunity for the production of affordable housing. Due to our disposition of *N.J.A.C.* 5:94–4.4, we need not address the taking claim.

### 2. *Age–restricted housing*

Municipalities may meet their growth share obligation by restricting not more than fifty percent of the affordable units to be built within the municipality to those households with residents aged fifty-five or over. *N.J.A.C.* 5:94–4.19. *See N.J.A.C.* 5:94–1.4 (definition "age-restricted housing"). Under the second round rules, a municipality could age-restrict a maximum of twenty-five percent of the affordable units. *N.J.A.C.* 5:93–5.14. COAH justified the increase to fifty percent on the basis that its methodology "determined that approximately sixty-one percent of the low- and moderate-income households formed from 1999 to 2014 are elderly." 36 *N.J.R.* 5780 (December 20, 2004).

Fair Share and Builders Association contend that the fifty percent age-restricted cap will severely diminish affordable housing opportunities for low- and moderate-income families with children. They argue that one of the primary objectives of the *Mount Laurel* doctrine is to create affordable housing opportunities for low- and moderate-income families with children in municipalities from which they have been previously excluded due to exclusionary zoning. They dispute the assertion that sixty-one percent of the future housing need will come from elderly households in search of affordable housing. To the contrary, they assert that a significant percentage of households over age fifty-five already have housing. Moreover, this class of elderly can compete with families for any new affordable housing, whereas

families with children are excluded from age-restricted housing. COAH and Municipal Amici defend the fifty percent age-restricted cap as a reasonable exercise of COAH's broad discretion. We conclude that the rule discriminates against low- and moderate-income households with children.

The desire to exclude families with children drives exclusionary zoning, a fact recognized when the Court first announced the *Mount Laurel* doctrine, *Mount Laurel I*, *supra*, 67 *N.J.* at 171, 336 *A.2d* 713, and again recognized in 2002, *Toll Bros.*, *supra*, 173 *N.J.* at 540, 803 *A.2d* 53. The cost of primary and secondary education generates a significant burden which can be lowered by limiting housing opportunities for families with children. *Mount Laurel I*, *supra*, 67 *N.J.* at 171, 336 *A.2d* 713.

COAH and Municipal Amici rely in part on the Court's holding in *Taxpayers Ass'n of Weymouth Twp. v. Weymouth Twp.*, 80 *N.J.* 6, 31, 364 *A.2d* 1016 (1976), *cert. denied sub nom Feldman v. Weymouth Twp.*, 430 *U.S.* 977, 97 *S.Ct.* 1672, 52 *L.Ed.2d* 373 (1977), which holds that municipalities may zone for mobile home parks limited to occupancy by the elderly. The Court reasoned the number of people over age sixty-five has been increasing, and the elderly have special social, economic, psychological and housing needs. *Id.* at 23–28, 364 *A.2d* 1016. The Court held that there existed a shortage of housing suitable to meet both the needs and the desires of the elderly. *Id.* at 29, 364 *A.2d* 1016. In the circumstances presented, the municipal ordinance zoning for age-restricted housing did not deprive the non-elderly of equal protection of the laws or substantive due process. *Id.* at 37–45, 364 *A.2d* 1016.

Appellants rely on cautionary language in the opinion that recognized the potential to abuse the power to zone for age-restricted housing. The Court warned:

> The peril to which our attention is drawn is a significant one. This Court recently had occasion to condemn zoning practices which deny a realistic opportunity to certain classes of people to live in desirable communities. *Southern Burlington Cty. NAACP v. Mt. Laurel Tp.*, *supra*, 67 *N.J.* 151 [336 *A.2d* 713]. In that case, we determined the impropriety of attempts by municipalities to improve their

financial position by selectively restricting new housing to categories of people who are net revenue producers, *i.e.*, those whose local tax contribution exceeds their demands upon locally financed governmental services. *Id.*, 67 *N.J.* at 185–86 [336 *A.2d* 713]. We also disapproved of attempts to restrain increases in school expenditures by directly or indirectly excluding families with children. *Id.*, 67 *N.J.* at 182–83 [336 *A.2d* 713]. Planned housing developments for the elderly can be exploited for either of these exclusionary purposes. In the short run at least, developments whose population is limited to the elderly may well be net revenue producers. *N.J. Office on Aging;* The Impact of Retirement Communities: Summary Report 47 (1974). In addition, older persons are unlikely to have school age children. Some communities have reinforced this possibility by imposing specific prohibitions on the occupancy of dwelling units by families with children. *See, e.g., Southern Burlington Cty. NAACP v. Mt. Laurel Tp., supra,* 67 *N.J.* at 168–69 [336 *A.2d* 713]; *Shepard v. Woodland Tp. Comm., supra,* 135 *N.J.Super.* [97] at 98 [, 342 *A.2d* 853 (App.Div.1975), *rev'd,* 71 *N.J.* 230 [364 *A.2d* 1005] (1976) ]; *Molino v. Mayor & Council of Glassboro, supra,* 116 *N.J.Super.* [195] at 201–202 [, 281 *A.2d* 401 (Law Div.1971) ]. Furthermore, by zoning portions of its undeveloped land for planned communities for the aged, a municipality may prevent development of that land as housing for other, less welcome, segments of the population. *Schere v. Freehold Tp.,* 119 *N.J.Super.* 433, 437, 292 *A.2d* 35 (App.Div.1971) [sic–1972], *certif. denied,* 62 *N.J.* 69, 299 *A.2d* 67 (1972), *cert. denied,* 410 *U.S.* 931, 93 *S.Ct.* 1374, 35 *L.Ed.2d* 593 (1973).

[*Id.* at 46–47, 364 *A.2d* 1016 (footnote omitted).]

The Weymouth Township Court noted further that while the Court in *Mount Laurel I* was "specifically concerned" with "the needs of younger families with children, the elderly are also a segment of the population whose needs and desires are appropriate considerations for municipal land use planning." *Id.* at 50, 364 *A.2d* 1016. Therefore, age-restricted housing could serve an inclusionary purpose, as well as an exclusionary purpose. *Ibid.* Thus, if zoning for age-restricted housing "substantially contributes to an overall pattern of improper exclusion, the fact that the ordinance may also benefit the elderly is neither an excuse nor a justification to sustain a challenge to a zoning provision." *Id.* at 51, 364 *A.2d* 1016. The Court added:

> To avert any misunderstanding, though, we reemphasize our concern about the exclusionary potential which zoning for senior citizen housing possesses. A pattern of exclusionary land use regulation cannot be rendered invisible to the judicial eye by camouflaging it with invocations of the legitimate needs of the elderly. The Court's failure to probe more deeply into the possible exclusionary effect of similar ordinances should not be understood to be the product of blindness to their potentially exclusionary character, but only the consequence of plaintiffs' decision not to try the case on that legal theory.

[*Id.* at 52, 364 *A.2d* 1016.]

COAH justifies *N.J.A.C.* 5:94–4.19 on the ground that demographic trends show a substantial increase in the number of households age sixty-five or over between 1999 and 2014. 36 *N.J.R.* 5807. COAH estimates that in 1999 there were 756,356 low- and moderate-income non-elderly households, and 336,942 elderly low- and moderate-income households. *Ibid.* By 2014, the number of low- and moderate-income non-elderly households is expected to grow to 805,661 households, whereas the elderly low- and moderate-income population is expected to grow to 413,587 households. *Ibid.* Thus, approximately two-thirds of the low- and moderate-income households in both 1999 and 2014 will be non-elderly, whereas approximately one-third of the low- and moderate-income households will be elderly. However, sixty-one percent of the actual growth in low- and moderate-income households will be represented by the elderly. *Ibid.* COAH asserted that elderly low- and moderate-income households will live mostly on retirement funds. *Ibid.*

> The movement of households into this age/income group is much larger than the loss of current 65+ households, which may disappear due to death, moving out of State, or moving out of the country. Sixty-three percent of the 65+ households are low or moderate income, whereas only 33 percent of the households with a younger head are low or moderate income. The "Baby–Boom" generation will be 65 or over in the next few years; and numerous households will fall within the definition of elderly low- and moderate-income.
>
> [*Ibid.*]

Objectors dispute COAH's statistics and its reasoning. Fair Share contends that the sixty-one percent figure relied upon by COAH was based on a "fundamental methodological flaw" because it was "not the result of thousands of lower income senior citizens migrating into New Jersey or new senior citizen households being formed, which households are in need of affordable housing." To the contrary, Fair Share asserts that solid data was available to show that only a small percentage of the households in the housing market for new housing are headed by an individual over sixty-five, or even over fifty-five, and that elderly households were "aging in place." While some of those households will lose income,

and therefore create a legitimate need for age-restricted housing, COAH should recognize that whenever possible municipalities would meet their growth share obligation by zoning for age-restricted housing in order to avoid the tax burden generated by families with children. Art Bernard, COAH's former Executive Director, added that allowing municipalities to age-restrict fifty percent of their affordable housing stock was inconsistent with the growth share methodology, which is based on new employment opportunities not likely to be filled by the elderly.

We conclude that the rule represents an exclusionary restriction. The elderly poor have access to almost one hundred percent of the new affordable housing that will be built under the growth share rules. However, municipalities may declare up to fifty percent of new affordable housing off limits to families with children. COAH's own projections show that between 1999 and 2014 nearly two-thirds of the low- and moderate-income population will be non-elderly, and only one-third elderly. 36 *N.J.R.* 5807. That suggests that poor families with children have a greater need for affordable housing than do the low- and moderate-income elderly. Moreover, nowhere does COAH take into account the possibility that the elderly, while of limited income resulting from retirement, have assets from savings or a home that they own to meet their housing needs without assistance. Low- and moderate-income families with children are not similarly situated; they are unlikely to own a home or have significant assets. Permitting municipalities to age-restrict fifty percent of new affordable housing generated within the municipality has the potential to significantly reduce the availability of affordable housing for poor families with children, and is therefore exclusionary.

COAH suggests that this court declare that municipalities may not age-restrict more than ten percent of new affordable housing. That is not our function. Moreover, since June 6, 1994, COAH has permitted municipalities to age-restrict up to twenty-five percent of new affordable housing. *N.J.A.C.* 5:93–5.14. The rule has never been challenged and municipalities have relied upon it in

devising second round affordable housing plans, some of which have more age-restricted housing than permitted. It has always been understood that excess second round age-restricted units could be credited towards a municipality's third round fair share. *See COAH Handbook, supra,* at 22. COAH would not violate the *Mount Laurel* doctrine if it continued to allow municipalities to age-restrict twenty-five percent of new development. Indeed, while we invalidate the expansion of the age-restricted cap from twenty-five percent to fifty percent in *N.J.A.C.* 5:94–4.19, the prior age-restricted cap of twenty-five percent should remain in place pending further agency action. To do otherwise will upset the practice and expectations of many years.

*3. Regional contribution agreements (RCAs)*

Fair Share attacks RCAs on two grounds: (1) they promote racial and economic segregation in violation of the Federal Fair Housing Act, New Jersey's Law Against Discrimination, and the State Constitution, and (2) COAH inadequately reviews and administers RCAs. RCAs are a creature of statute [12] and have survived claims that RCAs promote racial and economic segregation and violate the New Jersey Law Against Discrimination. *Hills Dev. Co., supra,* 103 *N.J.* at 47 n. 13, 510 *A.*2d 621; *see also Morris County Fair Hous. Council v. Boonton Twp.,* 209 *N.J.Super.* 393, 431–32, 507 *A.*2d 768 (Law Div.1985), *aff'd in part, rev'd in part sub nom Hills Dev. Co., supra,* 103 *N.J.* 1, 510 *A.*2d 621; *Twp. of Warren, supra,* 247 *N.J.Super.* at 165–70, 588 *A.*2d 1227. COAH's third round RCA rules, *N.J.A.C.* 5:94–5.1 to –5.5, are patterned on and not significantly different from the second round RCA rules, *N.J.A.C.* 5:93–6.1 to –6.6. In addition, a challenge to the facial validity of the third round rules is a poor vehicle for reviewing COAH's implementation and administration of the FHA. If, as Fair Share contends, COAH has been erroneously

---

[12] A3857 was introduced in the Legislature on December 14, 2006. The bill would eliminate RCAs and would also create a housing rehabilitation and assistance program for grants to municipalities.

approving or failing to adequately supervise RCAs, then it is incumbent upon Fair Share to identify the RCAs that have been improperly approved or inadequately monitored or enforced.

### 4. Credits and bonus credits

The first and second round rules offered bonus credits for rental housing. *See N.J.A.C.* 5:92–14.4(d); *N.J.A.C.* 5:93–5.15(d) (one and one-third credits per senior rental unit; two credits per family rental unit). The second round rules permitted the bonus credits for all rental units even though municipalities had the obligation to zone for affordable rental housing. *N.J.A.C.* 5:93–5.15(a). The third round rules continue the obligation to zone for rental housing, but offer bonus credits only for those rental units that exceed the required minimum. *N.J.A.C.* 5:94–4.20(d). In addition, excess credits from the second round can be applied to a municipality's third round growth share. *N.J.A.C.* 5:94–3.1(a)(1). These bonus credits "may be carried forward as a surplus only when the underlying units for which the bonuses have been granted have been built and occupied as evidenced by the issuance of a certificate of occupancy." 36 *N.J.R.* 5769.

The third round rules add a new credit and a new bonus credit. First, a municipality receives a new construction credit by extending affordability controls on existing affordable housing. *N.J.A.C.* 5:94–4.16(a). Second, a municipality receives two credits for each unit that is affordable to the very poor, that is, a member of the general public earning thirty percent or less of the median income. *N.J.A.C.* 5:94–4.22.

Fair Share and ISP contest the validity of these credits and bonus credits. Fair Share asks this court to hold that: (1) no unit can receive a credit unless the unit actually exists; and (2) no unit can be credited unless it is likely to be occupied by a person included in the calculation of need. Both appellants argue that the award of bonuses and credits unconstitutionally dilutes the affordable housing required to meet the identified statewide need. ISP adds that allowing bonus credits for rental units is unneces-

sary. If COAH believes that the State needs more affordable rental housing, it need only increase a municipality's minimum percentage. ISP also contends that the loss of an existing unit through expiring affordability controls should be viewed as adding to a municipality's present need, which the municipality can satisfy by extending the controls. Such units should not be treated the same way as the demolitions.

As COAH points out, this court has already upheld the use of bonus credits for rental units. *Calton Homes, supra,* 244 *N.J.Super.* at 456–58, 462, 582 *A.2d* 1024 (first round rental bonus rules); *In re Petition for Substantive Certification Filed by Freehold Twp.,* No. A–2521–01 (App.Div. Oct. 23, 2003) (second round rental bonus credit rules). We had described the first round rental bonus rule as "part of a comprehensive scheme to encourage municipalities and developers to build affordable rental units in the future." *Calton Homes, supra,* 244 *N.J.Super.* at 457, 582 *A.2d* 1024. We deferred to COAH's wide discretion and concluded that the first round rules were rationally related to the legitimate public purpose of encouraging the construction of more rental housing. *Id.* at 457–58, 582 *A.2d* 1024. We rejected the argument that rental bonus credits dilute satisfaction of the statewide need, holding that it was not necessary for COAH to reallocate to other municipalities the actual number of units not constructed as a result of rental bonuses. *Id.* at 462, 582 *A.2d* 1024. In upholding the second round rules, this court deemed *Calton Homes* dispositive. *Freehold Twp., supra,* slip op. at 36. This court rejected the argument that "the rule is now unreasonable or ultra vires because all municipalities have to plan for rental units, not just some municipalities, and because family rental units are entitled to a two-for-one bonus credit." *Id.* at 38.

In the second round rules, COAH awarded a two-for-one bonus credit because the "need for rental units and the subsidies necessary to produce them are so great as to warrant incentives to municipalities to provide plans that respond to the need." 25 *N.J.R.* 5772 (December 20, 1993), comment and response 112.

COAH did not believe it could require municipalities to construct rental housing, and developers would opt to build sales units rather than rental units because of the lower internal subsidies required for sales units. 26 *N.J.R.* 2307–08 (June 6, 1994), comment and response 55.

The rationale for bonus credits in the third round remains the same. COAH "believes that bonus credits are an appropriate tool to create incentives for types of housing that may not otherwise be provided in the municipality." 36 *N.J.R.* 5769. On the other hand, the third round rules are less generous in awarding rental bonus credits than the second round rules. First, COAH awards no rental bonus credits for age-restricted rental housing. *N.J.A.C.* 5:94–4.20(d). Second, a municipality is entitled to a bonus credit only to the extent that it provides for rental housing in excess of the twenty-five percent minimum. *Ibid.*

The third round rules do not dilute satisfaction of the housing need to the same degree as the first round or second round rules. This court has upheld the first round and second round rules. Appellants offer no persuasive reason for departing from existing precedent, particularly in the face of current rules that bestow less generous incentives than in prior rounds.

*Calton Homes, supra,* also supports the validity of *N.J.A.C.* 5:94–4.22, which states that "a municipality shall receive two units of credit for affordable units available to households of the general public earning 30 percent or less of median income by region." 244 *N.J.Super.* at 462, 582 *A.2d* 1024. COAH's rationale is the same as that justifying rental bonus credits:

> [COAH] believes it is appropriate to provide an incentive to municipalities that provide either rental or for-sale units to very-low-income households of the general public. [COAH] believes this step will provide the necessary incentive to encourage the production of affordable housing for very-low-income households.
> [36 *N.J.R.* 5781.]

If it is reasonable to award bonus credits for rental units to offset the increased subsidies necessary to create more rental housing in the State, then it is equally reasonable for COAH to provide incentives for housing for the very poor.

Finally, ISP contends that awarding a credit (but not a bonus credit) for units with expiring affordability controls unconstitutionally dilutes satisfaction of the identified statewide need. On appeal, COAH does not respond to this argument. However, COAH offered a detailed and persuasive response during the rulemaking process as follows:

> [COAH] does not believe this incentive to preserve the existing affordable housing stock dilutes the affordable housing need. On a regular basis, households move from affordable housing to market housing, usually for one of two reasons: (1) they currently rent an affordable unit and desire to own; or (2) they own an affordable unit but they would rather own a market unit, the increased housing value of which is not restricted. Further considerations are increasing family size and better economic positions. These households move to ownership housing and meet the affordability criteria necessary to obtain a mortgage for a market-rate unit.
>
> The turnover rate for affordable ownership housing is nine percent; it is five percent for rental housing (Source: Office of Housing Affordability Services, New Jersey [DCA]). Since ownership units are more prevalent than rental units, the overall turnover rate averages about eight percent annually.
>
> . . . .
>
> Eight percent annually means that the entire stock turns over in 12.5 years. It has been approximately 16 years since the appearance of the first COAH units. Since these currently occupied units are neither deteriorated nor crowded, they are not counted as part of the need, yet their presence has contributed to lowering the need. Given this turnover contribution to new households occupying these structures who could have occupied deteriorated structures or been part of a crowded structure, it is perfectly reasonable to offer a credit to extend the affordability controls of such units without diluting overall affordable housing need.
>
> [36 *N.J.R.* 5779.]

The above-quoted response fully answers each of ISP's objections on appeal. Extending affordability controls on existing housing prevents the loss of much needed affordable housing. Nothing in *Mount Laurel II* or the FHA prohibits COAH from adopting this technique, and ISP makes no convincing argument that *N.J.A.C.* 5:94–4.16 is arbitrary or unreasonable.

### 5. *Vacant land adjustments*

Briefly, the FHA directs COAH to adopt criteria and guidelines for adjusting a municipality's fair share if a municipality lacks sufficient vacant and developable land. *N.J.S.A.* 52:27D–

307(c)(2)(f). For many municipalities, the second round fair share obligation exceeded the municipality's capacity to meet its fair share. Under the second round rules, a municipality's fair share plan had to provide a method for satisfying its fair share, that is to say, its unmet need, should additional land become available. *N.J.A.C.* 5:93–4.1(b); *N.J.A.C.* 5:93–4.2.

The third round rules require that municipalities with vacant land adjustments satisfy their unmet need before any units can be credited toward the third round growth share. The regulation states:

> A municipality that received vacant land or durational adjustment pursuant to *N.J.A.C.* 5:93–4 or by Court order shall be deemed to have met its 1987–1999 cumulative affordable housing obligation provided it has implemented all of the terms of the substantive certification granted by [COAH] or the judgment of compliance ordered by the Court. All components of said certification or judgment that are designed to address unmet need pursuant to *N.J.A.C.* 5:93–4.1(b) shall continue in full force and any affordable housing units created thereunder shall be deemed to be credited toward unmet need until such time as the municipality has provided for its entire unmet need prior to being used to address the growth share obligation.
>
> [*N.J.A.C.* 5:94–3.4(a)(1).]

On appeal, ISP argues that *N.J.A.C.* 5:94–3.4(a) would violate the *Mount Laurel* doctrine if it were construed to allow unmet need to continue despite opportunities to satisfy it. COAH responds that the regulation should not be so construed. The regulation clearly requires municipalities that received a vacant land adjustment to first satisfy unmet need if redevelopment opportunities occur. In fact, COAH made it clear in adopting *N.J.A.C.* 5:94–3.4 that it would require developed municipalities with vacant land adjustments to meet their unmet need should redevelopment occur.

> [COAH] does not consider unmet need as a permanent adjustment to municipal affordable housing obligations. Vacant land adjustments previously granted by [COAH] will be carried forward, provided the municipality has implemented all the terms of the substantive certification granted by [COAH] or by the Judgment of Compliance ordered by the Court. All components of these plans designed to address unmet need pursuant to *N.J.A.C.* 5:93–4.1(b) must continue in full force and any affordable housing units created as a result will be credited toward unmet need until such time as the municipality has provided for its entire unmet need.

[COAH] does, in fact, require meaningful plans for unmet need. Furthermore, [COAH] intends to conduct a thorough review of second round plans for all municipalities that received a vacant land adjustment, either at the time of petition for third round substantive certification or at the time the municipality petitions for extended substantive certification pursuant to *N.J.A.C.* 5:95–15.2.

[36 *N.J.R.* 5770.]

We cannot assume that COAH will not do what it has promised to do. Indeed, COAH has reviewed the development and redevelopment opportunities in developed municipalities and recalculated the realistic development potential with the ultimate goal of requiring additional affordable housing should land become available. *In re Petition for Substantive Certification of Borough of Montvale*, 386 *N.J.Super.* 119, 122, 899 *A.2d* 327 (App.Div.2006). Accordingly, we conclude *N.J.A.C.* 5:94–3.4, as presently construed and as administered by COAH, is valid.

## IV

In the course of this opinion, we have affirmed COAH's methodology for calculating a municipality's rehabilitation share, *N.J.A.C.* 5:94–2.1(b); its decision to no longer reallocate present need, *N.J.A.C.* 5:94, Appendix A at 94–35; its continued use of RCAs, *N.J.A.C.* 5:94–5.1 to –5.5; and its regulations awarding credits, bonus credits and vacant land adjustments, *N.J.A.C.* 5:94–4.20(d), –4.16(a), –4.22, –3.4(a)(1). We have also declared that the agency implementation of its decision to subtract tax credit developments from statewide and regional housing need, *N.J.A.C.* 5:94, Appendix A at 94–44, by a so-called policy change must be addressed through rule making.

We have also held that COAH's use of filtering in calculating statewide and regional housing need, *N.J.A.C.* 5:94, Appendix A at 94–42, is unsupported by the record, thus requiring a reconsideration of the need calculation. We have also invalidated the growth share rules to the extent that the methodology relies on unissued data from the State Planning Commission, permits voluntary compliance, and excludes job growth and housing growth resulting from rehabilitation and redevelopment. We have also invalidated

the regulations that permit municipalities to provide affordable housing without offsetting benefits, and invalidated the regulation, *N.J.A.C.* 5:94–4.19, that permits municipalities to age restrict fifty percent of affordable housing to be built in a municipality.

Appellants Builders Association and Fair Share contend that this court should appoint a special master to assist COAH to formulate regulations that comply with the *Mount Laurel* doctrine and the FHA, rather than simply remand to the agency to commence the rule-making process once again. Builders Association cites the lengthy delay in the promulgation of the third round rules. Alternatively, appellants urge that the matter be remanded to the Office of Administrative Law (OAL) in order to develop a factual record.

Appointment of a special master by this court is unprecedented relief. We conclude the better course is to follow the path taken in *In re Six Month Extension, supra,* 372 *N.J.Super.* at 104–05, 855 *A.*2d 582. There, we identified the defects in COAH's procedural rules for securing interim substantive certification, but declined to specify the procedure that COAH must follow to cure the defects. *Ibid.* Rather, we remanded to COAH to determine, in the first instance, the amendments to the rules that were necessary to remedy the defects. *Ibid.* The court did establish a time limit, sixty days, for adoption of an appropriate rule. *Ibid.* *See also In re Mar. 22, 2002 Motion to Dismiss and Intervene in Petition of Howell Twp.,* 371 *N.J.Super.* 167, 188, 852 *A.*2d 258 (App.Div.) (court sets specific date by which COAH must complete administrative proceedings), *certif. denied,* 182 *N.J.* 140, 861 *A.*2d 845 (2004). In addition, this court stayed the commencement of any builder's remedy suits during the sixty days allowed to amend the regulation allowing extensions of substantive certification. *In re Six Month Extension, supra,* 372 *N.J.Super.* at 105, 855 *A.*2d 582.

The Legislature has granted COAH considerable authority to adopt policies and to fashion regulations that will provide a realistic opportunity for the construction of affordable housing. The Court has stated repeatedly that it is better for COAH to

address the issue than the courts. We also recognize that rule making is a dynamic process. COAH has already amended some of the third round rules, *see N.J.A.C.* 5:94–2.4(a)(4), and has recently proposed several others.[13] Thus, we conclude that it is appropriate to remand to the agency to commence the process to amend *N.J.A.C.* 5:94, the third round rules, to conform to the constitutional and statutory mandate. Time, however, is critical. The second round rules expired in 1999. The third round rules apply from 1999–2014, but effectuation of these rules has been compressed to a ten-year period and three years have already elapsed. We, therefore, direct that the rule-making process required by this opinion must be completed within six months.

We also conclude that applications for substantive certification must be stayed pending the amendment process. We do not disturb substantive certification approvals granted prior to issuance of this opinion. We also stay the filing of any builder's remedy actions for any municipality whose application for substantive certification is affected by this opinion. A stay furthers the policy of the FHA to resolve affordable housing disputes through COAH rather than in the courts. Municipalities that have acted in good faith in devising fair share plans to comply with the existing third round rules should not be subjected to an exclusionary zoning law suit. *See Hills Dev. Co., supra,* 103 *N.J.* at 49, 510 *A.*2d 621 (one purpose of FHA is to get courts out of the area of exclusionary law suits); *Elon Assocs., L.L.C. v. Twp. of Howell,* 370 *N.J.Super.* 475, 483, 851 *A.*2d 714 (App.Div.) (same), *certif. denied,* 182 *N.J.* 149, 862 *A.*2d 57 (2004).

Affirmed in part; reversed in part; remanded for regulatory action consistent with this opinion. We do not retain jurisdiction.

---

[13] The proposed regulations were published in the *New Jersey Register* on January 16, 2007. 39 *N.J.R.* 137(a).